575 A.2d 435

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. RONALD E. LONG, SR., DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued October 10, 1989—Decided June 21, 1990.

442

*Edward A. Jerejian* and *Rebecca R. Pressman,* Designated Counsel, argued the cause for appellant and cross-respondent (*Alfred A. Slocum,* Public Defender, attorney; *Edward A. Jerejian* and *Rebecca R. Pressman,* of counsel; *Rebecca R.*

Pressman, Sheila H. Mylan and Michael J. Witt, Designated Counsel, on the briefs).

Robin Parker, Deputy Attorney General, argued the cause for respondent and cross-appellant (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney).

Ronald E. Long, Sr. submitted supplemental pro se briefs.

The opinion of the Court was delivered by

O'HERN, J.

Defendant has been found guilty of murder in a liquor-store holdup. The pivotal question in his appeal is whether the jury verdict establishes guilt of knowing and purposeful murder, therefore rendering defendant death-eligible. The case was tried before our decision in State v. Gerald, 113 N.J. 40, 549 A.2d 792 (1988). In Gerald, the Court held that the 1979 amendments to the Code of Criminal Justice had created two forms of murder. One is intentional, death being defendant's purpose, the other unintentional, the death occurring as a result of the infliction of serious bodily injuries on the victim, but the death, nevertheless, not intended by defendant.

■ This latter form of murder was the counterpart of non-capital, second-degree murder under pre-Code law. Under pre-Code law, it was the deliberate, premeditated murder (first-degree murder) that merited death. Rather than incorporate this pre-Code terminology into the present Code, we refer to non-capital murder under the Code as "serious bodily injury murder" (SBI murder). In order to establish death-eligibility, the jury must determine that the defendant had the knowledge or purpose to kill and not the knowledge or purpose merely to inflict serious bodily injury that happened to result in death. Id. at 69, 549 A.2d 792. The Court held that the contrary interpretation, that execution could result from an unintended homicide, would render the statute unconstitutional under New Jersey's prohibition against cruel and unusual punishment. Id. at 89, 549 A.2d 792. In order to conform with what we believe

to be certain legislative intent and constitutional principle, the jury's verdict must establish that the accused had the knowledge or purpose to kill.

Accordingly, the central question is whether the jury's verdict established that defendant had the knowledge or purpose to kill. Because this question affects most of the trial issues, we shall focus our opinion primarily on it, then address issues not resolved thereby.

I

The case has a very complex trial record but a very simple factual scenario. On December 11, 1982, a gunman clad in a red baseball jacket, wielding a silver revolver, shot to death Albert Compton, the night manager of the Holiday Liquor Store. There was a single bullet to the chest. There were no witnesses to the killing itself. There was one witness on the street who identified Ronald Long as being in the vicinity of the liquor store around the time of the crime.

Earlier on the same evening, a similarly-clad gunman with a silver pistol had shot Alfred Carmichael at an apartment within walking distance of the Holiday Liquor Store. Several witnesses linked Ronald Long to the first shooting. If the same gun were used in the two crimes, Long would be a prime suspect. Ballistic tests proved that the same type of gun was used in both crimes. There was overwhelming evidence that defendant had access to such a gun, which was owned by his cousin, Harold Long. A major trial issue, then, was whether it was correct to try the Carmichael and liquor-store crimes together. A final wrinkle to the case was that a third holdup and shooting had occurred that same night with a perpetrator using the same type of revolver. The victim of this crime did not identify Ronald Long as the gunman.

The trial was set against this general background. The State alleged that Ronald Long had perpetrated the first two crimes.

It gathered scientific and testimonial evidence in support of those contentions.

## II

For purposes of this appeal and without endorsing each recital, we will use the issue-oriented version of facts as set forth in defendant's brief.

### A. GUILT PHASE

#### 1. *Illegal possession of the handgun*

The State alleged that in early December 1982, defendant, Ronald Long, stole a .25 calibre Raven Arms handgun and hollow-nosed bullets from his cousin, Harold Long, in Harrisburg, Pennsylvania. The State contended that this silver gun was used in the Carmichael and Compton shootings. Defendant admitted that he had Harold's gun in his possession in Atlantic City while staying with his brother Larry Long, in early December, but he claimed that he had bought it from Harold on December 2 and sold it for $90 on December 7 or 8, 1982 (three or four days before the shootings), to a Rastafarian friend of Carmichael. Defendant claimed that he wanted the gun for his own safety after having previously been shot.

Harold, however, had reported to the Harrisburg police that the gun had been stolen. He testified that when he saw defendant in late December while visiting defendant's brother, who was in a New Jersey prison, he had demanded that defendant return the gun. When various witnesses led the police to Harold, he gave the police that information along with hollow-nosed bullets similar to those he claimed were in the gun at the time defendant took the gun. The defense sought to undermine Harold's credibility by showing that he had given a false alibi for the night of the murder.

Defendant did not deny being in Atlantic City, and various witnesses testified that he had the gun in his possession. The question is whether he had it on the night of the shootings.

## 2. *The Carmichael shooting*

Carmichael testified that he and defendant were friends who had met through defendant's brother Joseph. Carmichael said that defendant came to his apartment about 6:00 p.m. on December 11, the night of the crimes, asking to borrow money. Carmichael refused. Carmichael then took defendant to Helen Thompson's apartment. While they were at Thompson's apartment, a man named Oliver Johnson stopped by. Johnson and Carmichael returned to Carmichael's apartment, and defendant joined them shortly thereafter. After Johnson left, defendant again asked to borrow money. When Carmichael refused, defendant showed him a handgun and asked him if he wanted to buy it. Carmichael got up to take the trash out. As he was walking down the hall, he was shot in the neck, behind the left ear. The defense contended that Carmichael had been shot by another person, a fact he did not want to disclose to the police. Carmichael gave conflicting stories to the police. He told the examining physician that he had fallen down and struck his head. He repeated that story to the police and said nothing about defendant having shot him. He later said that a man named Jerome Finch had shot and mugged him outside of his apartment between 9:00 and 11:00. He eventually told the detectives that defendant, not Finch, had shot him. Carmichael's credibility was questioned because of his drinking habits and other behavior traits and other witnesses contradicted his testimony.

## 3. *The Johnson identification*

A key witness was Oliver Johnson, who told the jury that when he went to Helen Thompson's apartment, he saw a black male whom he had never seen before. Later, in Carmichael's apartment, he noticed a red baseball jacket hanging on a chair.

Carmichael told him that the jacket belonged to the other male. When the unknown male returned to Carmichael's apartment, Carmichael introduced him to Johnson as "Joe Long's brother." Johnson claimed that he did not like Joseph Long, so he left. He said he had been at a bus stop about 8:10 p.m. when he saw the "other man" walk past him wearing a red baseball jacket and cap. On Sunday night he went to Carmichael's apartment, where he discovered that Carmichael had been severely injured. Johnson told the police about "the other man with the red baseball jacket and cap at Carmichael's apartment." He did not say that this man had been introduced to him as Joseph Long's brother. It was not until January 6, 1983, after defendant had become the primary suspect through other witnesses, that the Atlantic City Press ran an article about the shootings and defendant's picture with his name underneath furnished by the police. The article described both shootings, listed the victims, and identified defendant as the suspect.

Johnson gave various conflicting statements to the police, but at the time of trial he claimed he was positive that when he saw defendant's picture in the paper, he made the identification in his own mind. The defense sought to attack Johnson's testimony by asserting the unreliability of the police-suggested newspaper photograph, and offered as well to produce the testimony of an expert witness that such a related identification was inherently unreliable. The court refused to permit such expert testimony.

### 4. *The Compton killing*

Johnson testified that the man with the red jacket passed him at the bus stop at 8:10 p.m. It was a ten-minute walk from that spot to the Holiday Liquor Store where Albert Compton was shot. Thus, if the man who passed Johnson also shot Compton, the shooting could have occurred no earlier than approximately 8:20 p.m. Another witness, who arrived at the scene and called the police, estimated the time of the murder between 8:00 and 8:30 p.m. The police found that Compton had been shot in the

chest. A single bullet pierced the liver and pancreas and came to rest near the spinal column. The medical examiner determined that excessive blood loss caused the death. The owner of the liquor store established that the lottery machine had been closed as of 8:20 p.m. and the receipts of $795 were missing. There were no fingerprints at the scene. An empty shell case was on the floor.

### 5. *The ballistics evidence*

The State's ballistics expert concluded that the same .25 calibre automatic pistol fired the bullets removed from Carmichael and Compton. The Carmichael and Compton bullets, however, were different types of .25 calibre bullets. The defense believed that the gun might have been used in other shootings. There are 70,000 such .25 calibre automatic weapons in circulation, and approximately thirty-five brands exhibit the same ballistic patterns as found on the Carmichael and Compton shells.

### 6. *The Gracco "red herring"*

Albert Gracco, an Atlantic City service station attendant, was robbed and shot in the neck by a shell from a .25 calibre handgun at approximately 3:30 a.m. on December 12, 1982. The shell casing was the same as that found at the liquor store. The State's expert determined that Gracco had been shot by the same calibre weapon used in the Carmichael and Compton shootings. Gracco described the assailant as a black male in his early twenties, about five feet eight inches in height and wearing a long trench coat. Johnson had given the same physical description of the man in Carmichael's apartment. Barry Turner, a friend of defendant, claimed that defendant had picked up Larry Long's trench coat. No gunpowder residue had been found on this trench coat. Gracco viewed a lineup that included defendant and six other inmates. He failed to identify defendant, but did identify another man. Defendant was never charged with the Gracco shooting. The State's

theory of the case was that one need only follow the gun forward from Harrisburg to Larry Long's apartment, to Carmichael's apartment, to the liquor store, to see that defendant shot both Carmichael and Compton. The defense's theory, on the other hand, was that one need only follow the gun backwards from the Gracco shooting to see that defendant did not shoot any of the victims. Defendant complains that the trial judge referred to the Gracco incident as a "red herring," and that although the prosecutor did not mention it in his opening statement, he was able to argue to the jury that defendant shot Gracco as well as the other two men.

### 7. *Events subsequent to the shooting*

Barry Turner, whom the defense impeached on the basis that he was facing indictment on other charges, claimed that he had seen defendant in Larry Long's apartment at 1:00 a.m. on December 12. He said defendant had been wearing a red jacket and had had about $80 in his pocket. Turner testified that defendant had told him "to read my paper," when he asked defendant where he had gotten the money. The prosecutor confronted Turner with a prior statement about reading something in the papers. In his opening statement, the prosecutor told the jury that defendant had said, "You will read it in the paper." The defense sought to discredit Turner by showing that he had been served with a criminal summons just prior to having given his statement concerning defendant. Defendant testified that he had first learned he was a suspect on December 23 when he telephoned his mother while police officers were visiting her. According to one of the police officers, defendant asked, "Which man died?" Defendant denied this conversation.

### 8. *The confession to Herron Pate*

Shortly before trial, Harold Long's mother, Herron Pate, told an Atlantic City detective that on Christmas night 1982 defendant had confessed the murder to her. She had previously furnished the police with his whereabouts. She explained that

the subject of the confession came up by accident while she and the detective were at an airport shortly before trial. She denied that her last-minute revelation was an attempt to save her son, Harold, who was defendant's cousin, from an investigation of his involvement.

### 9. *The Perona identification*

William Perona was at the liquor store the night Compton was shot. He noticed a suspicious-looking black male in the store. His identification did not match that given by Johnson. He did not learn of the shooting until December 29, when he read about it in the newspaper. He told the police that he had been in the store around 8:30 p.m. He said that before going into the store, he saw that the winning lottery number for the day had been posted, which meant that he could have been at the store no earlier than 8:20 p.m., the time Compton closed out the lottery machine. He could not have been at the store later than 8:35 p.m., when another customer discovered Compton. Perona told the police that the suspicious-looking man was heavy-set, with a long brown or grey coat. The detective did not believe that Perona was correct about the time he had been in the store. He arranged for Perona to be hypnotized. While under hypnosis, Perona said that he had been in the store just after 8:00 p.m. and had left before the winning lottery number had been posted.

Perona later became a relevant witness when Paul Pettigrew, a jail-house informant, said that defendant told him that a cousin had been involved in the Holiday Liquor Store robbery and that a man who was later hypnotized by the prosecutor had run into the cousin-accomplice at the entrance to the store. The prosecution then used Perona's statement in its opening statement to bolster the credibility of Pettigrew because "only the killer" could have known what Pettigrew knew. The defense moved for a mistrial on the ground that the State had tampered with Perona as a witness by hypnotizing him. But when the court denied this motion, the defense called Perona. He testi-

fied that when he arrived at the store shortly before 8:00 p.m., consistent with his post-hypnotic story, as he was walking out of'the store, another man walked in. The man was wearing a dark trench coat with white dress shoes and a pull-over hat. He had a mustache and beard, and was in his thirties. He said that the man's right hand was in his pocket and his left hand at his side. Perona said he drove away, and when he drove back, he saw police cars outside. He estimated that he had left the store and passed by again around 8:10 p.m. The defense offered a witness to show that the hypnosis had impaired Perona's memory and destroyed exculpatory evidence. The judge ruled that this evidence would have the effect of impeaching the credibility of defendant's own witness.

### 10. *The confession to Pettigrew*

While awaiting trial in Atlantic County Jail, defendant met Paul Pettigrew, who was also awaiting trial for a series of robberies in the Atlantic City area. He had pled guilty to five of the robberies. He sought to withdraw his plea, but was sentenced to a thirty-five-year term with a seventeen-and-one-half-year parole disqualifier. He was angry with defendant because he had partially influenced him to plead guilty. Pettigrew claimed that just before his sentencing on March 15, defendant had talked to him about the Carmichael and Compton shootings. Defendant admitted shooting Carmichael, and claimed that after he had shot Carmichael, he ran into his cousin. The two men went to the liquor store. On their way in, they encountered a white male who saw the cousin. Defendant mentioned that the prosecutor's office had tried to hypnotize the customer. After the customer left, defendant and his cousin remained in the store while defendant made a purchase. Pettigrew said that defendant then shot the clerk as he reached for a paper bag, or possibly a gun, because "he didn't want to leave [a] witness behind."

Pettigrew admitted that he went to the prosecution hoping for a deal. According to Pettigrew, no promises were made but

the prosecutor said that he would recommend that the sentence be reduced if Pettigrew gave favorable testimony. He was also told that the prosecutor would recommend that he be sentenced to another facility. Pettigrew's motion for reconsideration was still pending at the time of trial. After the jury convicted defendant of the Carmichael shooting and the Compton murder, the court reduced Pettigrew's sentence from thirty-five years with seventeen-and-one-half years parole disqualifier to a straight seventeen-and-one-half-year term with no mandatory minimum, the equivalent of about five years of real time.

## B. PENALTY PHASE

The sole aggravating factor the State relied on in the sentencing phase was the felony murder. The defense raised the mitigating factors of defendant's character, *N.J.S.A.* 2C:11–3c(5)(h); lack of significant history of prior criminal activity, *N.J.S.A.* 2C:11–3c(5)(f); and defendant's age, twenty-four, at the time of the offense, *N.J.S.A.* 2C:11–3c(5)(c). The defense called many witnesses to prove defendant's character. His friends described defendant as the leader of his family after his father left when defendant was only ten. Various character witnesses asked the jury to spare defendant's life, but the court sought to restrain such direct appeals to the jury. Defendant's mother said that defendant was the one member of the family whom the others could count on for help after her separation from defendant's father. Defendant had served eighteen months in the Marines. He had been civic-minded. The defendant sought to prove a lack of significant prior criminal activity. To rebut that evidence, the State introduced evidence of four prior offenses, including testimony from a purse-snatching victim from Philadelphia.

The jury unanimously found the felony-murder to be an aggravating factor. It found age not to be a mitigating factor. The jurors were divided on whether defendant's character and lack of prior significant criminal activity were mitigating

factors. The jury unanimously found that the aggravating factor outweighed any mitigating factor beyond a reasonable doubt. The court sentenced the defendant to death and set a date for execution. Defendant appeals to us as of right under *Rule* 2:2–1(a)(3).

### III.

Did the jury's verdict establish death eligibility under *N.J.S.A.* 2C:11–3c?

The jury's verdict established that defendant was the liquor-store killer. Long argues, however, that the verdict does not necessarily establish that he killed intentionally. There were no eyewitnesses to the murder, and the only evidence of intent is Pettigrew's testimony that defendant confessed to him in prison that he had shot Compton because "he didn't want to leave [a] witness behind." However, defendant testified that he had never had this conversation with Pettigrew. A jury could infer that Long inflicted the wounds on the victim without the intention to kill.

The question is a close one. The trial court instructed the jurors that in order to convict the defendant on Count Eleven, the murder count of the indictment, they should find

that [defendant] walked into the liquor store at Atlantic Avenue. That he had the gun in his hand. That he put it to Compton and that he purposely or knowingly pulled the trigger and killed him and that's what it takes for you to come back with guilty on that. So Count Eleven, the State must prove to you that Mr. Long walked into the liquor store where Compton was the clerk, pulled the trigger on the gun and killed him. Purposely or knowingly.

The court did not charge aggravated manslaughter or reckless manslaughter. The court charged felony murder with respect to Count Ten of the indictment. Not having the benefit of the *Gerald* decision, the trial court gave no instruction with regard to SBI murder. If the defendant is not guilty of capital murder, but is guilty of either SBI murder or felony murder, he is subject to the same punishment of life with a minimum of thirty years without possibility of parole. *N.J.S.A.* 2C:11–3.

In response to a jury request, the court recharged Count Eleven:

> Count Eleven charges capital murder. Criminal homicide constitutes capital murder when the actor purposely or knowingly causes, by his own conduct, that is, by his own hand, the death of another. If that's not satisfactory, then you'll write me another note.

The murder count of the indictment was in the short form authorized by *Rule* 3:7–3(b), and charged the defendant with the language of the statute. That *Rule* requires that a murder indictment merely

> specify whether the act is murder as defined by *N.J.S.A.* 2C:11–3(a)(1), (2) or (3) and whether the defendant is alleged to have committed the act by his own conduct and whether the defendant is alleged to have procured the commission of the offense by payment or promise of payment, of anything of pecuniary value.

The murder count of the superseding indictment charged that defendant

> did purposely or knowingly cause the death of or serious bodily injury resulting in the death of Albert Compton in that he committed the homicidal act by his own conduct, contrary to N.J.S. 2C:11–3a(1) or 2C:11–3a(2), and against the peace of this State, the government and dignity of the same.

At the time of this trial, the Judges Bench Manual for Capital Cases did not, as it now does, require a jury to return a special verdict on whether the defendant knowingly or purposely caused the death of the victim.

Neither the indictment nor the verdict sheet distinguished between the two forms of murder. The trial court decided to submit a "very simple verdict sheet" to the jury, together with the indictment. The verdict sheet was in the form of checkmarks next to the counts in the indictment. When defense counsel suggested that the court should explain in its charge the significance of Count Eleven, the court agreed to tell the jury that "Count Eleven is the count that will decide death-eligibility." In his summation, the prosecutor forecast the *Gerald* issue by telling the jury that it would be charged with respect to SBI murder, but suggested that it need pay no attention to it because, in his view, this was a case of intentional murder. Nevertheless, the court interrupted the prosecutor and coun-

selled him that it would charge the jury with respect to the law. As noted, the prevailing practice at this time did not distinguish between the two forms of murder as determining death eligibility.

Hence, the court did not explain to the jury that the indictment embraced two forms of murder, one capital and the other non-capital. We have uniformly held that at the core of the guarantee of a fair trial in a criminal case is the judicial obligation to insure that the jury's impartial deliberations are based solely on the evidence and in accordance with proper instructions. *See State v. Simon*, 79 *N.J.* 191, 398 *A.*2d 861 (1979). The instructions did not fully define the offense charged in the indictment as a murder charge is now understood under *Gerald*. Defense counsel argues that a court may not "truncate" the definition of the murder statute and thus deny a jury the mechanism to decide which of the two forms of murder charged has been proven. In that respect, his claim is similar to that of a request for a lesser-included-offense charge. We have regularly held that a defendant is entitled to such a charge if there is any evidence "that would have afforded the jury a rational basis" for convicting the defendant of the lesser offense. *State v. Moore*, 113 *N.J.* 239, 290, 550 *A.*2d 117 (1988).

In this case, there was a slim but rational basis for such a verdict. There was no direct evidence of how the killing occurred. Although Pettigrew said that defendant had shot Compton "because he didn't want to leave [a] witness behind," he also said that defendant had reacted to the victim's reaching down, which defendant thought might be for a gun rather than a bag. The single bullet entered Compton's chest and pierced his liver and pancreas before lodging near his spinal cord. Compton died an hour later, and was still alive when the robber left the store. The State emphasizes that the bullet was the deadly hollow-nosed type prohibited in New Jersey, and that the gunman shot at close range. Defense counsel points to the fact that had the liquor-store perpetrator wanted to be sure to silence his victim, he could have fired more bullets to be sure

that the victim died. Although these defense theories may not persuade a jury, they are not beyond the realm of the possible. This Court stated in *State v. Ramseur* that a trial court should charge the jury regarding "all of the possible offenses that might reasonably be found from such facts." 106 *N.J.* 123, 271 n. 62, 524 *A.*2d 188 (1987) (quoting *State v. Choice*, 98 *N.J.* 295, 299, 486 *A.*2d 833 (1985)).

In *State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989), the Court affirmed a conviction of capital murder notwithstanding the absence of a *Gerald* charge because the Court was convinced beyond a reasonable doubt that the error was harmless. In that case the defendant, once a trained soldier, had mutilated the victim with a number of blows using a combat knife. His defense was not that he did not intend to kill his former lover but rather that his reactions were the instantaneous product of rage.

In *State v. Gerald, supra*, 113 *N.J.* 40, 549 *A.*2d 792, the defendant was one of several perpetrators of a stomping-type murder of an elderly victim. There we said that we were

unable to discern from the record whether Gerald was convicted of purposely or knowingly causing death, or purposely or knowingly causing serious bodily injury resulting in death. Count Thirteen of the indictment charges simply that Gerald "did purposely or knowingly cause the death of, or serious bodily injury resulting in the death of [the victim] * * *," and the jury, following a charge that did not ask it to draw the distinctions or apply the principles that are enunciated in this opinion, convicted Gerald on the thirteenth count without specifying for which of the four distinguishable offenses he was convicted. [The Court refers to four distinguishable offenses because two states of mind, knowledge or purpose, may apply to capital murder and SBI murder.] From our reading of the record we are satisfied that the jury rationally could have convicted Gerald, not only of purposely or knowingly causing death, but also—and equally rationally—of purposely or knowingly causing serious bodily injury resulting in death. If the latter, defendant would not be death-eligible. Without a determination of the basis for the jury's verdict, we cannot sustain the imposition of the death penalty * * *. [*Id.* at 91–92, 549 *A.*2d 792.]

The question then is what a reading of the record establishes. Not every crime with a gun involves an intent to kill. This case falls on the spectrum somewhere among *State v. Rose*, 120 *N.J.* 61, 576 *A.*2d 235 (1990) (firing shotgun

at close range into victim's stomach held to involve only intent to kill); *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990) (requiring *Gerald* charge when defendant professed to have intended only to injure despite having shot victim at close range); and *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990) (also decided today) (perpetrator of tavern holdup entitled to *Gerald* charge when he asserts that he shot only to injure proprietor). An admittedly thin line separates these cases as the differing opinions in each case demonstrate, but we are convinced that this case falls within the band of cases that requires a *Gerald* charge. Since the defendant denies guilt, he does not, like *Pennington* or *Coyle*, say that he shot without an intent to kill, but there was only a single shot that went under the rib cage and pierced the liver and pancreas. There was surely lethal force here in the use of a firearm, but there was not such overwhelming lethal force that we are convinced beyond a reasonable doubt that the error in the charge was harmless. As in *Gerald*, *Coyle* and *Pennington*, from our reading of the record we are satisfied that the jury rationally could have convicted defendant of knowingly causing serious bodily injury that resulted in Compton's death. Since the murder verdict could rationally have embraced capital or noncapital murder, we cannot sustain the death penalty. For the reasons stated in *State v. Gerald, supra,* 113 *N.J.* at 92, 549 *A.*2d 792, if a sentence of death is to be imposed, the guilt phase of the capital murder charge must be retried from the beginning. Because the robbery that establishes the single aggravating factor charged (murder in the course of a robbery) is inextricably bound to the murder count, that robbery count would have to be established in the murder proceeding. See discussion in Part V, *infra,* 119 *N.J.* at 504–505, 575 *A.*2d at 467–468.

▋ In addition, although defendant's defense was inconsistent with any theory of accomplice liability, counsel could have argued to the jury that the State's evidence of the other accomplice's role might have created a doubt, not that defendant was there, but that he had been the shooter, thus entitling

him to an accomplice charge. *See State v. Moore, supra,* 113 *N.J.* 239, 550 *A.*2d 117. Recall that Gracco described the shooter as wearing a long coat. We recognize the public impatience with capital-punishment jurisprudence but we cannot conscientiously or constitutionally deny this defendant the right to be tried in accordance with correct principles of law. We have repeatedly stated that we are convinced that the Legislature wished the law to apply equally to all capital defendants. *State v. Jackson,* 118 *N.J.* 484, 492, 572 *A.*2d 607 (1990) (citing *State v. Biegenwald,* 106 *N.J.* 13, 66–67, 524 *A.*2d 130 (1987)).

## IV

Because our decision on the *Gerald* issue renders moot many of the other issues raised in defendant's appeal, we shall not address them in detail except to the extent that they may recur in a new capital trial or affect the validity of the verdicts that remain.

### A.

Were the four new counts added to the superseding indictment the product of prosecutorial vindictiveness requiring the dismissal of those counts?

Under *Blackledge v. Perry,* 417 *U.S.* 21, 94 *S.Ct.* 2098, 40 *L.Ed.*2d 628 (1974), a reindictment following certain judicial action that subjects defendant to greater punishment than did a prior indictment is presumptive evidence of retaliation for the exercise of constitutional rights. Here, as a result of defendant's successful challenge to the county's jury-selection process, the prosecutor required resubmission of all death-penalty cases for superseding indictments. We do not sense any qualitative difference between the original indictment and the subsequent indictment. Both indictments charge defendant with capital murder. Defendant's superseding indictment added four charges to the original nine. The difference in the second indictment is more in form than substance.

None of the four new charges could result in more severe punishment than those in the original indictment. The added armed-robbery count was a lesser-included offense of the original felony-murder charge; both merged into the murder conviction. The added attempted-murder count was of the same degree as the original aggravated-assault charge, and in fact merged into the aggravated-assault conviction. The two added weapons possession counts, both fourth-degree crimes, subjected defendant to less severe punishment than the original third-degree weapons offenses. In all, the added counts did not "subject[ ] defendant to a significantly increased potential period of incarceration." *Id.* at 28, 94 *S.Ct.* at 2102, 40 *L.Ed.*2d at 634–35.

In *Blackledge v. Perry* the United States Supreme Court discussed *North Carolina v. Pearce*, 395 *U.S.* 711, 89 *S.Ct.* 2072, 23 *L.Ed.*2d 656 (1969), in which it had held that imposition of a harsher sentence following a successful appeal and reconviction violates due process unless special findings of justification overcome a presumption of vindictiveness. The *Blackledge* Court emphasized that its presumption required no evidence of actual vindictiveness on the part of the prosecutor. The rule's purpose was to avoid the potential for such vindictiveness and thus avoid chilling a defendant's exercise of constitutional rights. 417 *U.S.* at 28, 94 *S.Ct.* at 2102, 40 *L.Ed.*2d at 634. However, "the Court has been chary about extending the *Pearce* presumption of vindictiveness when the likelihood of vindictiveness is not as pronounced as in *Pearce* and *Blackledge,*" inasmuch as its operation may effectively bar legitimate criminal prosecution. *Wasman v. United States*, 468 *U.S.* 559, 566, 104 *S.Ct.* 3217, 3221, 82 *L.Ed.*2d 424, 432 (1984). The Supreme Court has declined to apply the presumption when there is little likelihood of prosecutorial vindictiveness.

In *United States v. Goodwin*, 457 *U.S.* 368, 102 *S.Ct.* 2485, 73 *L.Ed.*2d 74 (1982), the Supreme Court held that the presumption was not warranted because there was no reasonable likelihood of vindictiveness. There the defendant at first initiated

plea negotiations with the prosecutor on several misdemeanor and petty offense charges. When defendant requested a jury trial instead of pleading, the prosecutor obtained a four-count indictment, including a felony count. *Id.* at 371, 102 *S.Ct.* at 2487, 73 *L.Ed.*2d at 79. The Court stated that "mere opportunity for vindictiveness is insufficient to justify the imposition of a prophylactic rule." *Id.* at 384, 102 *S.Ct.* at 2494, 73 *L.Ed.*2d at 87. The facts did not establish a realistic likelihood that the prosecutor would respond to defendant's pretrial demand "by bringing charges not in the public interest." *Ibid.,* at 384, 102 *S.Ct.* at 2494, 73 *L.Ed.*2d at 87. Also very important was the absence of facts invoking a policy central to both *Pearce* and *Blackledge* —disfavor of retrial of a decided question. 457 *U.S.* at 383, 102 *S.Ct.* at 2493, 73 *L.Ed.*2d at 87.

Similarly here, where the prosecutor submitted before trial a superseding indictment that did not significantly increase the potential punishment, we decline to apply a presumption of prosecutorial vindictiveness. Defendant has submitted no evidence of actual vindictiveness. The trial court accepted the prosecutor's explanation that the additional counts were initially omitted inadvertently.

### B.

Were the grand and petit juries that indicted and tried the defendant drawn from lists that were unconstitutionally under-representative of blacks or otherwise in violation of jury selection statutes?

Defendant had mounted an earlier successful challenge to the method by which juries were selected in Atlantic County. *See State v. Long,* 204 *N.J.Super.* 469, 499 *A.*2d 264 (Law Div.1985). In *State v. Gerald, supra,* 113 *N.J.* at 126–33, 549 *A.*2d 792, we considered this issue and concluded that the error, if any, was not of constitutional dimension. There we also concluded that the recommended revision in procedures proposed by the Law Division in this case would assure fuller achievement of statutory and constitutional requirements for jury selection.

This appeal presents a renewed challenge ·to the Atlantic County jury selection process. Defendant produced evidence not of actual underrepresentation of minorities but of continued systemic problems. He challenged two aspects of the system: (1) the elimination of eligible persons by failure to use motor-vehicle lists in a substantial portion of the county, and (2) failure to eliminate a substantial number of duplicates on the merged source list. Specifically, the jury selectors had determined not to include certain zip codes that overlapped Atlantic and other counties, and had failed to weed out duplicates, *e.g.*, John M. Smith of Ten Baltic Avenue, Egg Harbor City, and John Smith of Twelve Baltic Avenue, Egg Harbor City.

The factual findings of the trial court more than adequately dispose of the issues. For example, on the issue of omitted drivers, one omitted zip code contained 292 drivers from Atlantic County and 31,940 from Cumberland County. More important, there was no showing that the 292 might not have already been on the "jury wheel" as registered voters of Atlantic County.

On the question of duplication, an expert witness for defendant came up with various percentages of duplication, ranging up to eighteen percent, but he based his estimates on statistical probabilities, not actual results. For example, one field survey showed that only thirteen of thirty-three *possible* duplicates were in fact duplicates. Moreover, the trial court found that some of the expert's data were of questionable soundness.

In short, we agree with the analysis of the Atlantic County assignment judge. That court accepted a possible duplication rate of 8.5% and an omission of less than two percent of the "jury wheel" due to the zip-code overlaps, but reasoned that there was no clear evidence of violation of statutory or constitutional guidelines involving omissions that "substantially undermine[d] the randomness and objectivity of the selection mechanism or cause[d] harm to the defendant." *State v. Ramseur, supra,* 106 *N.J.* at 232, 524 *A.*2d 188.

It used that same basic reasoning to conclude that the systemic omissions did not violate statutory guidelines:

[T]he court has considered the relatively limited nature of the statistical deviations, the need to balance the risk of unnecessary duplication against the risk of unwarranted removal of qualified jurors, the lack of specific statutory administrative procedures for how to compile the "jury wheel," the relatively recent identification of problems with respect to eliminating duplication and fully including all names from the DMV lists, along with the developing state of jury management. Placed in this context, defendants have failed to demonstrate that the inadequacies here substantially undermined the randomness and objectivity of the jury selection mechanism.

Here, as in *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, there was no evidence that the grand- and petit-jury panels as composed were not representative of the community, nor was there any suggestion that the independence of the grand or petit jury was compromised. The methods used reflected a commitment to improve the juror-selection process rather than an attempt to undermine or to inject invidious discrimination into randomness. The goal was an objectively-random list that reached substantially all sectors of the juror pool. The deficiencies were technical, not substantial.

### C.

Was the 971–day delay from the date of arrest to trial a denial of defendant's rights to speedy trial under state and federal constitutions?

■ Defendant argues that the 971 days that passed from the day of his arrest to the day trial commenced violated his constitutional right to a speedy trial. If the State were entirely or in large part responsible for the delay, such a time delay would violate defendant's right to a speedy trial. In this case, however, defendant filed numerous pretrial motions that accounted for most of the delay between the date of his arrest and the date of trial.

The sixth amendment protects a defendant's right to a speedy trial after arrest or indictment. *United States v. MacDonald,* 456 *U.S.* 1, 7, 102 *S.Ct.* 1497, 1501, 71 *L.Ed.*2d 696, 703 (1982); *State v. Szima,* 70 *N.J.* 196, 199–200, 358 *A.*2d 773, *cert.*

*denied,* 429 *U.S.* 896, 97 *S.Ct.* 259, 50 *L.Ed.*2d 180 (1976). In addition to protecting defendants against prosecutorial delay, *see Pollard v. United States,* 352 *U.S.* 354, 361, 77 *S.Ct.* 481, 485, 1 *L.Ed.*2d 393, 399 (1957), the speedy-trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial. As a practical measure, that protection benefits both defendants and society. The United States Supreme Court said in *Barker v. Wingo,* 407 *U.S.* 514, 519–20, 92 *S.Ct.* 2182, 2186–87, 33 *L.Ed.*2d 101, 110–11 (1972):

> In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused. The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system. In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes.

> \* \* \* \* \* \* \* \*

> [Undue delay] contributes to the overcrowding and generally deplorable state of [local prisons]. Lengthy exposure to these conditions "has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult." (footnotes omitted)

In *Barker v. Wingo,* the Court formulated a four-part test to analyze a defendant's sixth-amendment speedy trial claim. The enumerated factors are: (1) the length of the delay, (2) the reasons for the delay, (3) whether and how defendant asserted his speedy trial right, and (4) the amount of prejudice to defendant caused by the delay. *Id.* at 530, 92 *S.Ct.* at 2192, 33 *L.Ed.*2d at 117; *State v. Gallegan,* 117 *N.J.* 345, 355, 567 *A.*2d 204 (1989); *State v. Szima, supra,* 70 *N.J.* at 201, 358 *A.*2d 773.

This case primarily involves the second *Barker* factor, the reasons for the delay. See Appendix for a time line of the relevant events that caused the delay in the commencement of the trial. The record shows that many of the pretrial delays were attributable to defendant's motions and adjournments. We have held that "[a]ny delay that defendant caused or requested would not weigh in favor of finding a speedy trial violation." *Gallegan, supra,* 117 *N.J.* at 355, 567 *A.*2d 204

(citing *United States v. Loud Hawk,* 474 *U.S.* 302, 316, 106 *S.Ct.* 648, 656, 88 *L.Ed.*2d 640, 655 (1986); *Barker v. Wingo, supra,* 407 *U.S.* at 529, 92 *S.Ct.* at 2191, 33 *L.Ed.*2d at 116); *see also United States v. Jones,* 524 *F.*2d 834, 850 (D.C.Cir.1975) ("A defendant should not be able to take advantage of a delay substantially attributable to his own trial motions when the court acts upon them within a reasonable period of time."). Defendant's successful challenge of the Atlantic County jury-selection process caused six months of the delay. Other reasons for the delay involved the substitution of defense counsel due to Pettigrew's testimony and the reindictment of defendant. In sum, although a substantial amount of time lapsed between defendant's arrest and the beginning of the trial, there is no indication that the prosecution intentionally delayed the proceedings to gain an unfair, tactical advantage. *See Barker v. Wingo, supra,* 407 *U.S.* at 531, 92 *S.Ct.* at 2192, 33 *L.Ed.*2d at 117. Accordingly, we find that the delay here did not constitute a violation of defendant's right to a speedy trial.

### D.

Did the State violate the Interstate Agreement on Detainers Act by not bringing the defendant to trial within 180 days of his return to New Jersey?

As noted, defendant surrendered to authorities in Philadelphia on January 7, 1983, to face charges of criminal conspiracy and robbery stemming from a March 1982 purse-snatching incident. On January 10, New Jersey authorities issued a no-bail detainer against defendant, and on February 8 filed an extradition request for defendant.

On June 28, defendant filed a rendition request with New Jersey authorities for his return to Atlantic County to face the instant charges pursuant to the Interstate Agreement on Detainers Act (I.A.D.), *N.J.S.A.* 2A:159A–1 to –15. On August 17, defendant pled guilty to the Pennsylvania charges and was sentenced to time served and probation. Seven days later he was extradited to New Jersey, and on August 26 defendant was indicted. Defendant's trial commenced in September 1985.

Defendant now argues that the State failed to comply with Article III of the I.A.D., which states in relevant part that a defendant

shall be brought to trial *within 180 days* after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint * * *. [*N.J.S.A.* 2A:159A–3 (emphasis added).]

The I.A.D. is an interstate compact among forty-eight states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. *Carchman v. Nash*, 473 *U.S.* 716, 719, 105 *S.Ct.* 3401, 3403, 87 *L.Ed.*2d 516, 520 (1985). Its purpose is to "minimize uncertainties resulting from outstanding charges against prisoners, detainers based on such charges, and difficulties in securing speedy trial of prisoners who are incarcerated in other jurisdictions, all of which produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." Annotation, "Interstate Agreement on Detainers Act," 98 *A.L. R.*3d 160, 167 (1980). To achieve this purpose, the I.A.D. established certain procedures under which a prisoner against whom a detainer has been lodged may be taken into temporary custody of the receiving state.

The issue here, as we see it, is whether defendant had the proper standing while detained in Philadelphia to bring this argument. Although he was detained in Philadelphia from January 7 to August 24, 1983, he was never sentenced to a term of imprisonment for those charges. We believe that the legislative intent of the I.A.D. was for its application to be limited to incarcerated persons serving a term of imprisonment. *N.J.S.A.* 2A:159A–3 provides:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment * * *.

This statutory interpretation of the I.A.D. has found support in both federal and state courts. *See, e.g., United States v. Roberts,* 548 *F.*2d 665, 670 (6th Cir.) (where prisoner was confined in a holding facility and awaiting sentencing, court held that I.A.D. was inapplicable because prisoner was "not serving a term of imprisonment" according to statutory language), *cert. denied,* 431 *U.S.* 931, 97 *S.Ct.* 2636, 53 *L.Ed.*2d 246 (1977); *State v. Thompson,* 19 *Ohio App.*3d 261, 264, 483 *N.E.*2d 1207, 1210 (1984) ("It is clear from the [statutory] language quoted that the party states did not intend to include discharged prisoners within the statutory scheme.") Our Appellate Division has addressed this issue in *Carrion v. Pinto,* 79 *N.J.Super.* 13, 190 *A.*2d 199 (1963), ruling that the I.A.D. was not applicable when "[a]t the time [petitioner-prisoner] was delivered to the New Jersey authorities he was not serving a 'term of imprisonment' in Massachusetts." *Id.* at 16, 190 *A.*2d 199. Accordingly, because defendant had not been sentenced to a term of imprisonment while in Philadelphia, we find no violation of Article III of the I.A.D.

## E.

Was defendant prejudiced by the joinder of the Compton homicide and the other related counts, primarily the Carmichael assault?

Because a capital trial is bifurcated, some of the evidence that may be relevant in the guilt-phase proceeding is not relevant in a penalty-phase proceeding.

Turning our attention to the guilt phase, the counts are tied together by the common thread of the same gun allegedly being used unlawfully or possessed in the commission of the distinct crimes of the Compton and Carmichael shootings. *Rule* 3:7-6 provides:

Two or more offenses may be charged in the same indictment or accusation * * * if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common plan.

We have no doubt that these transactions are connected. *See State v. Hardison*, 204 *N.J.Super.* 1, 10–11, 497 *A.*2d 868 (App.Div.1983), *aff'd*, 99 *N.J.* 379, 492 *A.*2d 1009 (1985). In addition, as a practical matter, had these cases been tried separately, evidence of the other crimes would have been admissible under *Evidence Rule* 55 in the Compton murder trial to establish either identity or the weapon used.

This, then, is not a case like *State v. Orlando*, 101 *N.J.Super.* 390, 244 *A.*2d 506 (App.Div.), *certif. denied*, 52 *N.J.* 500, 246 *A.*2d 457 (1968), in which two entirely unrelated crimes that were not signature crimes were tied together, thus giving the State an unfair advantage in having the jury evaluate the proofs.

This case is troubling, however, because it is a capital case. Something that may not prejudice a non-capital case may prejudice a capital case. A central theme of capital-punishment jurisprudence is that the jury's discretion must be channeled by objective factors to prevent the randomness or self-selection of cases for capital punishment. *See Zant v. Stephens*, 462 *U.S.* 862, 103 *S.Ct.* 2733, 77 *L.Ed.*2d 235 (1983). Only certain aggravating factors may be considered by a jury in deciding a capital penalty. *N.J.S.A.* 2C:11–3.

Sometimes, during a penalty phase of a capital case, however, the jury will hear evidence that is not relevant to the aggravating factors. *State v. Rose*, 112 *N.J.* 454, 548 *A.*2d 1058 (1988), illustrates the problem. A defendant who had put his good character in issue was subject to withering cross-examination about collateral aspects of his conduct, particularly his mistreatment of certain girl friends. There we held that although such evidence might be relevant for the limited purpose of testing the credibility of the defendant, a trial court would have to give careful instructions on the limited purpose for which the testimony could be considered by the jury. *Id.* at 508, 548 *A.*2d 1058.

In addition, there was evidence in *Rose* of racial animosity the defendant had shown on a prior occasion. Although that evidence may have been relevant to dispel his defense of an accidental discharge of the gun, it surely was not relevant to an aggravating factor. It too should have been given a limiting charge.

In this case the evidence of other crimes surfaced in the guilt phase. Such evidence may relate to the question of guilt by establishing the identity of defendant as Compton's killer. After all, if the same gun was used in the Carmichael shooting by a man in a red jacket, the evidence is plainly relevant. When a court learns that such evidence will be offered, it should inform the jury of the purpose of the evidence and its relevance, not as an aggravating factor, but as part of substantive proof of murder. The court should caution the jury during the guilt phase that the purpose of such evidence is limited.

Prior to the penalty phase, the court could again ask the jurors if they can consider defendant's death eligibility in light of no more and no less evidence than the Legislature has intended. We continue to repose a sound measure of discretion in our judges and juries. Obviously, if the first case were a rape or child-abuse case linked by a common event to an unrelated murder, a court could well conclude that admission into evidence of the other crimes would be too prejudicial during the penalty phase. *See State v. Moore, supra,* 113 *N.J.* at 276–77, 550 *A.*2d 117; *State v. Monturi,* 195 *N.J.Super.* 317, 478 *A.*2d 1266 (Law Div.1984). Another factor complicates this case. The Gracco shooting, although not part of the State's case, must be carefully sorted out by the jury for its limited relevance. After all, the jury might well agree with the State that defendant shot Gracco too. Could that uncharged event influence the jury's penalty deliberations?

We are satisfied that the joinder of the counts in this case was justified under *Rule* 3:7–6, and that evidence of other crimes would have been admissible as well under *Evidence*

*Rule* 55 for a limited purpose in the guilt phase. Because the penalty phase must be retried, we need not decide whether the absence of a limiting instruction with respect to the evidentiary significance of the other-crimes evidence tainted the death sentence.

While we are discussing this issue of limited purpose for which evidence may be introduced in penalty-phase proceedings, we note the problem posed in this case by cross-examination of one of Long's jailhouse companions about an alleged incident in which Long had thrown hot tea in the face of a guard. This sort of problem arose in *State v. Rose, supra,* 112 *N.J.* at 504, 548 *A.*2d 1058, in which we ruled that prosecutors must have a sound evidential basis to pose such a question. In addition, juries must receive limiting instructions with respect to the purpose of such evidence. *Id.* at 506, 548 *A.*2d 1058.

### F.

Should the unauthorized seizure of defendant's medical records have resulted in dismissal of his indictment or, in the alternative, a disqualification of the Atlantic County Prosecutor's Office?

Prior to trial the State obtained, through the use of grand-jury subpoenas issued by representatives of the prosecutor's office, defendant's medical records of his confinement at veterans hospitals and other institutions. In pretrial proceedings, the Law Division suppressed those records. It refused to disqualify the Atlantic County Prosecutor's Office because it was convinced that no harm had been done. Defendant now contends that the trial court erred in refusing to disqualify the prosecutor. Defendant also argues that the seizure of his medical records amounted to misconduct so egregious as to require the dismissal of the indictment.

A review of the record indicates that there was no taint or advantage given to the prosecution from the unlawful seizure of the records. Also, the State did lawfully possess the medical records for a period of time. During the pretrial proceedings,

defendant filed a notice of intent to pursue an insanity defense and, pursuant to the rules of discovery, supplied the State with a medical report. As part of its preparation to rebut the insanity defense, the State had a psychiatric expert examine defendant. The court ruled that the State was entitled to have the remainder of defendant's medical and psychiatric records as part of discovery and ordered the records turned over to the State. Thus, although the prosecutor improperly obtained these records, he would have later received them in the ordinary course of discovery. *See N.J.S.A.* 2A:84A-22.4.

Defendant relies on our decisions in *State v. Sugar (I)*, 84 *N.J.* 1, 417 *A.*2d 474 (1980), and *State v. Sugar (II)*, 100 *N.J.* 214, 495 *A.*2d 90 (1985), for the proposition that the prosecutorial misconduct violated his fourth-amendment and fifth-amendment rights, as well as the physician-patient privilege. However, the instance of misconduct in this case in no way rises to the level of outrageous conduct in *Sugar (I)*, *supra*, in which arresting officers unlawfully tape-recorded privileged and confidential conversations between the defendant and his attorney while the defendant was in police custody. Nor is the conduct in any sense equivalent to that in the celebrated case of Daniel Ellsberg, in which the government broke into his psychiatrist's office, suppressed evidence of such conduct, and destroyed documents. In *Ellsberg*, Judge Byrne found that the "totality of the circumstances * * * offended a sense of justice" and dismissed the indictment. *United States v. Russo & Ellsberg*, No. 93–73 (C.D.Cal. May 11, 1973). However, in *Sugar (I)*, the gravity of that constitutional abridgement did not require the dismissal of the indictment under a fundamental fairness analysis. 84 *N.J.* at 15, 417 *A.*2d 474. Applying the *Sugar (I)* analysis to this case, because the State would have had access to the records due to defendant's contemplated insanity defense, the prosecution was "purged of all taint from [the legal] investigatory excess," which would not require dismissal of the indictment under fundamental fairness. *Ibid.*

Nor was there the secondary *Sugar* problem, the sixth-amendment claim that defendant had been denied effective assistance of counsel. In this case we do not have an infringement of the attorney-client privilege but of the physician-patient privilege. Defendant claims, however, that the seizure of his medical records had an adverse impact on his relationship with his attorney, which warrants a dismissal of the indictment. In some instances, a deliberate attempt on behalf of a prosecutor to destroy the attorney-client relationship may warrant the dismissal of an indictment; however, "absent demonstrable prejudice [to the defendant], or substantial threat thereof, dismissal of the indictment is plainly inappropriate." *United States v. Morrison*, 449 *U.S.* 361, 365, 101 *S.Ct.* 665, 668, 66 *L.Ed.*2d 564, 569 (1981). The record here reveals that the only impairment of the attorney-client relationship created by the State's seizure of the medical records was defendant's unreasonable response in refusing to cooperate with his lawyers after discovering that his records had been disclosed. Furthermore, defendant received new counsel long after this issue arose. The substituted counsel certainly had nothing to do with the seizure of the medical records or with defendant's prior contemplation of an insanity defense. Thus, any alleged impaired relationship with counsel ceased long before trial began.

Finally, we find neither a fifth-amendment violation nor an infraction of *Evidence Rules* 23 and 25 with regard to defendant's claim. Under *Evidence Rule* 23(1) the accused in any criminal action has a right not to testify or be called as a witness. Because the records were never introduced at trial and defendant was not called to testify with regard to the records, there is no *Evidence Rule* 23(1) violation. The privilege against self-incrimination embodied in the fifth amendment, New Jersey common law, and *Evidence Rule* 25 is also inapplicable. Nothing in these medical records "incriminates" defendant in any way.

Thus, defendant's claim must fail. Even though his physician/psychiatrist-patient privilege was violated, defendant waived that privilege when he gave notice that he intended to pursue an insanity defense. *N.J.S.A.* 2A:84A–22.4; *cf. State v. Alston,* 212 *N.J.Super.* 644, 515 *A.*2d 1280 (App.Div.1986) (privilege waived by notice of intent to invoke defense of battered-woman's syndrome). The fact that an insanity defense has been withdrawn is of no consequence. "[O]nce privileged material is disclosed, the privilege of nondisclosure is waived." *State v. Bishop,* 187 *N.J.Super.* 187, 192, 453 *A.*2d 1365 (App. Div.1982); *see Evid. R.* 37.

## G.

Did the death-qualification *voir dire* accord defendant a fair opportunity to identify automatic death-penalty proponents or did it in any way deny defendant his rights to due process and an impartial jury?

Defendant challenges four aspects of the jury selection: (1) that the refusal to permit a more probing death-qualification *voir dire* denied defendant a fair opportunity to identify automatic death-penalty proponents; (2) that the trial court improperly limited *voir dire* on prejudice; (3) that the exclusion of five potential jurors because of their reservations about the death penalty was improper absent unambiguous statements of their inability to follow their oaths; and, finally, (4) that the process of death qualification excluded a disproportionate number of women from the jury.

Preliminarily, we note that we have consistently reiterated our concern that in capital cases court-conducted *voir dire* is not an end in itself but merely an efficient means to select an impartial jury. We have encouraged the trial courts in capital cases to be "sensitive to permitting attorneys to conduct some *voir dire." State v. Biegenwald,* 106 *N.J.* 13, 30, 524 *A.*2d 130 (1987). The general tenor of court-conducted *voir dire* in this case was that the court, in consultation with counsel, first prepared a questionnaire, which it submitted to all the jurors. That submission of the questionnaire followed a

general briefing of jurors in which the court outlined the contours of the case. Defendant claims that the court gave the jurors an easy way out by suggesting to them that they would be disqualified "only if [your views] cause you to vote automatically one way or the other without regard to the evidence." But this sentence had been preceded by a balanced discussion about the differing views that jurors might have about the death penalty, the only qualification being that they could follow the court's instructions. The *voir dire* made it clear that the court applied this test in accordance with correct standards of law.

As the jurors were called individually, the court addressed general questions to them concerning their ability to follow the death-penalty law and specific questions with respect to any points highlighted in the questionnaire. The questionnaire itself, which has been provided to us, briefly covered issues of racial bias. During the course of the questioning, several jurors candidly admitted that they possessed such latent traits. No specific instance has been shown in which counsel was denied the opportunity to question individual jurors. As a matter of fact, the trial court sought guidance from counsel about the way in which *voir dire* would be conducted. At one point in the initial *voir dire* (before the superseding indictment) the judge discussed the process with counsel and asked them, "Is this the way to go?" He himself preferred to be more specific in his questioning but acceded to the prosecutor's request not to expand the questioning with specific details of this case lest each side try the case on the *voir dire*. In the initial *voir dire*, the court expressed the belief that the system might have worked as well by putting fourteen people in the box without the death-qualification of each person individually.

When the court renewed *voir dire* after the superseding indictment, it acknowledged the prosecutor's suggestion, based on the earlier jury selection, that "it was most effective last time by letting the juror, to some degree, lead you to where you want to go"—in other words, there should be a flexible ap-

proach to the questioning rather than a reading of a set formula. The court used familiar examples for evaluating jurors, such as that one would not evaluate the jurors' attitudes in the same way as when they were "mouthing off in John's bar after a softball game." Rather, it would consider whether, having undertaken the solemn obligation to sit, they could justly and impartially administer the death penalty in accordance with law.

Moreover, just before the jury was finally seated, the court responded to objections about the *voir dire* by saying, "I hope that the people who take this case on appeal are the same people who are here and not somebody who is not here so that the true facts and the true flavor of the proceedings will be considered by the reviewers." The court stated: "This proceeding has not been done by [rote]. If you [defense counsel] have any objection to a specific procedure and make a request to change it, I will act on that." The court explained that it had given the jurors the questionnaire explaining the death penalty in general terms to avoid a reading of it to them "in a flat monotone." The court explained that after it had reviewed the questionnaire, "I have made a conscious effort to relax them and to draw them out," asking them personal questions about where they had gone to college and so forth. This trial court did not insist on putting all questions to the jurors but said: "[M]y practice has been, and I want it clear, my practice has been to turn to counsel in each and every instance and say 'open season, go at it.' Now I don't know what else to do. I don't know what else to do."

The court referred to one occasion on which it had to stop counsel from what it considered an extensive line of questioning, but on the whole it was tolerant of questioning. Indeed, it said that when it detected that attorneys were getting onto a sensitive line of questioning with a few jurors, "I try to pick it up and ask it so that it doesn't look partisan. I also know that * * * what I mean, you don't want them to get irritated at you. I try to pick up on the line of questioning that you've asked

even to the point of throwing in this idea you have asked * * *. To try to give it a balance and even-handedness." In short, this trial court was quite open to considering the requests of counsel and indeed permitting them to examine witnesses themselves.

Defendant raises objections concerning qualification of five jurors. We are satisfied that in each of the instances cited the court concluded, using the *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), and *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985), test that we have adopted, *see Ramseur, supra,* 106 *N.J.* at 255–56, 524 *A.*2d 188, that the jurors' views on the death penalty would have substantially interfered with the performance of their duty. For example, juror Mary G. had had a very disturbing experience sitting on a jury before in a case in which a man fled from the courtroom following a guilty verdict and drowned, in the juror's eyes, as a suicide victim. As she explained to the court, "I would try to be fair but still that would be on my mind." The court concluded, "It is quite obvious she doesn't want on her conscience the fact that she had anything to do, even tangentially, with anything that results in the death of another person and I will disqualify her."

Another juror was asked by the court, "You don't think you could vote for the death penalty?" His answer was, "No, I don't think so." Other jurors expressed reservations that would have substantially interfered with their duty to administer the capital-punishment law. We have no doubt that the court was fair in its evaluation of jurors. An example was a juror who was scrupled against the death penalty and told the court, "I just don't feel right about it, you know." When asked whether he could nonetheless follow his oath, the juror replied, "I know what you're trying to say, but just saying a flat yes or no, I just can't give a definite answer." He repeated: "I don't know, being in a situation, being able to give a clear answer. I wouldn't want to be in violation of the court." When the

prosecutor attempted to disqualify him, the court refused. It answered: "That is not the way he feels [unalterably opposed to the death penalty]. I read him right. Anything else?" The court found this juror qualified.

We agree that court or counsel could have asked additional open-ended questions directed to specific feelings that jurors may have had about capital sentencing or racial bias in the type of case before the court. *See State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (expressing preference that jurors be questioned about bias in concrete context of case). On balance, however, our review of the record reveals that the "overall scope and quality of the *voir dire* was sufficiently thorough and probing to assure the selection of an impartial jury." *Biegenwald, supra,* 106 *N.J.* at 29, 524 *A.*2d 130. Nothing in the process disproportionately excluded women as a class. *See State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188.

### H.

Were the prosecutor's opening and closing remarks so inflammatory as to deprive defendant of a fair trial?

In *State v. Williams, supra,* 113 *N.J.* 393, 550 *A.*2d 1172, we reiterated our long-standing commitment to the proposition that "[a] prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved. Absolute adherence to this duty is stringently compelled in capital cases where the penalty is death." *Id.* at 448, 550 *A.*2d 1172 (citing *State v. Biegenwald, supra,* 106 *N.J.* at 39, 524 *A.*2d 130; *State v. Rose, supra,* 112 *N.J.* at 524, 548 *A.*2d 1058; *State v. Ramseur, supra,* 106 *N.J.* at 324, 524 *A.*2d 188).

Defendant claims several instances of prosecutorial misconduct. He points to the prosecutor's reference in his opening to facts that were never placed in evidence—specifically that he would prove that Barry Turner would testify that defendant told him that he would "read it in the paper" how defendant got the money on the night of the murder. In fact,

Barry Turner never testified to this effect, although he was impeached with a prior statement that sounded much as if he had said that. Defendant complains that the prosecutor tried to convince the jury that he, the prosecutor, had some superior understanding of the truth such that the jurors simply had to put themselves in the "hands of the prosecutor."

 Having reviewed the State's opening and closing, we find that they are for the most part balanced and evidence-oriented. It may have embellished the record to refer to Pettigrew as a "golden witness," or to defendant's consciousness of guilt (after all, defendant says he turned himself in wearing a red jacket), but these are inconsequential complaints.

 However, we find several references very marginal, particularly those in the opening to defendant as the "guest of honor" and as an "equal opportunity" shooter. This latter expression is particularly inappropriate because of its coded significance. That mutation of the civil-rights theme can have no possible relevance to a capital-murder case. The prosecutor may have intended to allay any racist overtones in an interracial crime, but the jury had already assured the court that it would not consider color in any way.

 And we would be naive not to sense that the use of the word "brother" to refer to a black capital-defendant carries, as defense counsel put it, "emotional baggage" that has no place in criminal cases. The prosecutor's suggestion in his cross-examination of DeVault that Long was "planning a revolt" and "plotting" with other inmates to challenge the methods used to generate Atlantic County's jury lists raises the question of what message was being conveyed to the jury. Should the defendant die because of his aggressive challenges to the institutions of government or because of statutory aggravating factors? We can only repeat what we have said in the past: "[W]e are prepared to take more severe action as required to ensure that capital trials are conducted without resort to improper remarks and questionable tactics by the

State's prosecuting attorneys." *State v. Williams, supra,* 113 *N.J.* at 456, 550 *A.*2d 1172 (quoting *State v. Spano,* 64 *N.J.* 566, 569, 319 *A.*2d 217 (1974)).

In this case the most damaging extraneous factors had the capacity to influence primarily the penalty phase of the trial. The "equal-opportunity" shooter remark was but one brief moment at the end of a three-hour opening going over the detailed factual presentations the prosecutor would make before the guilt phase started. The penalty phase will be rerun for other reasons and should be conducted in accord with the guidelines of *State v. Rose* and *State v. Williams.* The murder verdict on Count Eleven does not establish death-eligibility under *State v. Gerald,* and that count will have to be retried in a further capital proceeding.

## I.

Was the statement made to Pettigrew obtained in violation of defendant's right to counsel because Pettigrew was acting at the instigation of the prosecution?

The law is set forth in *Massiah v. United States,* 377 *U.S.* 201, 84 *S.Ct.* 1199, 12 *L.Ed.*2d 246 (1964), which held that a defendant has a right to counsel after being indicted. Absent defendant's waiver of that right, the State may not seek an uncounseled statement from him, nor may it use an undercover agent to circumvent that constitutional right. However, we are satisfied that the trial court correctly found no violation of the constitutional right in this case. Such a violation requires that a jailhouse informant act as a State agent in deliberately eliciting incriminating statements from the defendant. *See United States v. Henry,* 447 *U.S.* 264, 270, 100 *S.Ct.* 2183, 2186, 65 *L.Ed.*2d 115, 122 (1980). Here Pettigrew testified that he first considered contacting police in connection with the Long case after being sentenced on March 15, 1985, to thirty-five years with a seventeen-and-one-half-year parole disqualifier. Defendant, who had been advising him on legal strategy, helped him with an appeal and motion for reconsidera-

tion of sentence. But Pettigrew said he thought he could get his sentence reduced by "turning State's evidence." He called the Atlantic City Major Crimes Squad and was connected with the prosecutor's office on March 25, 1985. On hearing that Pettigrew had information on the Long case, the prosecutor's office told Pettigrew on March 27 that although it would make no sentence recommendation, it would inform the court of his cooperation and would move him out of the jail where defendant was held and into protective custody. Pettigrew was cautioned not to discuss the case further with defendant, and was moved to the Yardville Correctional Facility the following day, March 28, 1985. On April 3, 1985, six days later, Pettigrew gave his statement on Long's confession, which he testified had been made between March 12 and March 15, more than ten days before Pettigrew's March 25 communication with the police. Under those facts, there was no agreement between Pettigrew and the State at the time defendant confided in him, and therefore no agency relationship and no *Massiah* violation.

Defendant contends, however, that because Pettigrew had called an assistant prosecutor to discuss his own charges in December 1984, he was likely acting as the prosecutor's agent when, early in March, defendant allegedly confessed to him. The State counters that the December communication, which shortly included counsel, pertained solely to negotiations for Pettigrew's plea bargain on nine pending indictments. Pursuant to that bargain, Pettigrew entered retraxit pleas of guilty on January 31, 1985.

Pettigrew became acquainted with defendant in August 1984, when both were inmates in the Atlantic County jail. Defendant advised him on his legal defense. The two saw each other frequently although they slept in different sections, Pettigrew in a dormitory and defendant in a cell block. In February, Pettigrew requested a transfer to a cell block, but when offered Cell Block C, which was not near defendant, he declined. Pettigrew explained that he declined because at the time of the offer the move to the new jail was imminent. On March 12,

1985, all inmates were moved to a new facility, where Pettigrew and defendant were placed in the same cell block. Pettigrew said that they became close there and that defendant confided in him concerning the crimes. The warden testified that the two were placed in the same cell block completely by chance, but defendant points out that Pettigrew was the only inmate from his dormitory in the old jail placed in defendant's area of the new jail, which he claims breached the original relocation plan.

The trial court denied defendant's request for a pretrial evidentiary hearing on the relationship between Pettigrew and the prosecutor's office and to discover what promises had been made in exchange for his cooperation. The court also denied defendant's renewed request for a *Massiah* hearing during trial. As evidence of an agency relationship, defendant pointed to the three days between March 25 and March 28, when Pettigrew, having already been in touch with the prosecutor's office, continued to speak to defendant. The State countered that defendant had confided in Pettigrew before the initial March 25 communication, and had not spoken to Pettigrew concerning the crimes after that date.

The facts of record were insufficient to warrant suppression of the alleged confession. Nor do we find that the court's denial of an evidentiary hearing on the *Massiah* issue was an abuse of discretion. Such pretrial hearings require a threshold showing of good cause. *R.* 3:13–1(b); *see State v. Ortiz*, 203 *N.J.Super.* 518, 522, 497 *A.*2d 552 (App.Div.) (pretrial hearing held at discretion of trial judge under totality of circumstances), *certif. denied*, 102 *N.J.* 335, 508 *A.*2d 212 (1985). Lest this issue crop up again in collateral proceedings, see, *e.g., Carter v. Rafferty*, 826 *F.*2d 1299 (3d Cir.1987) (State resolution of constitutional claim reversed on federal *habeas corpus*), *cert. denied*, 484 *U.S.* 1011, 108 *S.Ct.* 711, 98 *L.Ed.*2d 661 (1988), it may be wise on remand to permit examination of any of the prosecutor's staff who met with Pettigrew any time

before he was moved away from defendant on March 28, 1985. Resolution of the *Massiah* issue is especially significant here, inasmuch as Pettigrew's testimony is crucial in establishing defendant's intent to kill.

## J.

Was the witness cooperation agreement between prisoner Pettigrew and the prosecution an invitation to perjury denying defendant a fair trial and due process of law?

In *State v. Fort*, 101 *N.J.* 123, 501 *A.*2d 140 (1985), we held that a "no testimony" plea agreement violated codefendants' constitutional rights to due process and to present witnesses in their favor. We found such an agreement contrary to the fundamental purpose of trial, because its effect was to "suppress the truth by sealing the lips of witnesses." *Id.* at 131, 501 *A.*2d 140. Here, however, according to the State, Pettigrew was asked not to keep silent but to testify truthfully. Pettigrew was promised that if he furnished, and testified to, helpful information, his cooperation would be made known to the judge deciding his application for sentence reduction. Defendant contends that the agreement invited perjury by offering reward for desired testimony. Pettigrew received the reward two weeks after defendant's conviction, when on December 5, 1985, Pettigrew's thirty-five-year sentence for armed robbery was reduced by half and his parole disqualifier vacated.

Defendant's objection is not based on any failure to disclose. *See Giglio v. United States*, 405 *U.S.* 150, 92 *S.Ct.* 763, 31 *L.Ed.*2d 104 (1972) (nondisclosure of immunity agreement, affecting witness's credibility, violated due process). The State disclosed the agreement to the defense in discovery and to the jury during Pettigrew's direct examination. Defense counsel expanded on its implications during cross-examination and in closing argument. Nor is the objection based on any contingency of result expressed in the agreement. See discussion in *United States v. Waterman*, 732 *F.*2d 1527 (8th Cir.1984) (holding that admission of testimony of accomplice whose plea

agreement was contingent on outcome violated due process), *vacated*, 732 *F*.2d at 1533 (*en banc*), *cert. denied*, 471 *U.S.* 1065, 105 *S.Ct.* 2138, 85 *L.Ed.*2d 496 (1985). The agreement expressed no such contingency.

Certainly a witness-cooperation agreement, like a plea agreement, provides inducement to testify favorably, but the risk of perjury must be balanced against the potential contribution of truthful testimony. *See United States v. Dailey*, 759 *F*.2d 192 (1st Cir.1985) (risk of perjury created by accomplice's plea agreements insufficient to violate due process). Courts routinely admit testimony by witnesses who have entered into agreements with the State. *See, e.g., Hoffa v. United States*, 385 *U.S.* 293, 87 *S.Ct.* 408, 17 *L.Ed.*2d 374 (1966) (admission of testimony by paid government informer did not violate constitutional rights). Disclosure enables procedural safeguards, allowing "the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Id.* at 311, 87 *S.Ct.* at 418, 77 *L.Ed.*2d at 387.

Here the court instructed the jury on credibility: "You get people up here who tell you things that you may find just aren't—are inherently unbelievable. * * * Did they have something to gain? Did they have something to lose?" On conviction of crime it charged:

> It's a credibility problem. * * * Pettigrew and Turner and whoever else. * * * You may not want to believe him as much as you want to believe somebody who had not [been convicted]. Of course, also with Turner and Pettigrew, the assertion is made by the defense that it's not only that aspect of credibility, but because they have contact with the law and had cases pending and have been sentenced and whatnot, that they're really testifying to things they testified to because they had received favors and you want to consider that and whether you accept that proposition and how it affects their judgment. So that's conviction of crime.

Based on the disclosure of the witness-cooperation agreement during direct testimony, cross-examination, and jury instructions, we find no violation of due process or denial of fair trial in the agreement between Pettigrew and the State.

## K.

Did the trial court improperly deny defendant's discovery request for information on any investigation of Harold Long as well as all Atlantic County crimes involving .25 calibre handguns pending since December 11, 1982?

Defendant contends that *Rule* 3:13–3, governing the scope of discovery in criminal trials, would include his requests for information on police investigation of his cousin Harold, and on other crimes in which the gun used to shoot Carmichael, Compton, and Gracco was used in a crime traceable to another suspect. The court denied the request for information on police investigations of Harold Long, except for any possible future agreements between him and the prosecutor. Apparently Harold Long was never a suspect, and was not investigated. If there were internal notes on a tentative investigation, they would be expressly excluded from discovery under *Rule* 3:13–3(c). The court denied the request for complete information on all other county .25 calibre handgun crimes based on overbreadth and absence of the relevance required by *Rule* 3:13–3(a). We believe that the court properly exercised its discretion in denying the discovery.

## L.

Did the various evidentiary rulings of the trial court constitute reversible error?

### 1.

Should an expert have been permitted to testify that Perona's hypnotism impaired his memory?

Perona was the witness who entered the Holiday Liquor Store sometime on the evening of December 11, 1982. After reading about the shootings in the newspaper, he communicated to the prosecutor's office what he felt would be valuable information concerning the Compton homicide. He told Detective Jubilee that as he went into the liquor store to check the lottery numbers, he bumped into a heavy-set black man, approximately twenty-six years old, who was wearing a long brown or grey coat. Perona stated that these events happened

at approximately 8:30 p.m., but he was somewhat unsure of the actual time. Because the police determined that the Compton homicide must have occurred between 8:20 and 8:35 p.m., Detective Jubilee arranged for a hypnotist to explore whether Perona's recollection could be hypnotically refreshed on the actual time that he was in the liquor store. While under hypnosis, Perona stated that he had been in the store just after 8:00 p.m. (well before Compton was shot), and had left before the winning number for the day had been posted. Furthermore, he described the person he bumped into as a man in his early thirties who wore a long, dark-colored coat.

Defendant offered the testimony of Dr. Frederick Evans, an expert on hypnotism, to show how hypnotism might have impaired Perona's memory. The gist of defendant's argument for its admissibility was that Perona's pre-hypnotic account of the suspicious man he bumped into at the liquor store around 8:30 p.m. that night was clearly exculpatory evidence. Defendant further complained that the prosecutor used Perona's statement in his opening to bolster Pettigrew's credibility and the "unnamed cousin" theory without calling Perona as a witness. The court refused to admit Dr. Evans' testimony after a *Rule* 8 hearing.

We find no error in the court's decision to prohibit that testimony. We considered the issue of hypnosis testimony in *State v. Hurd*, 86 *N.J.* 525, 432 *A.*2d 86 (1981). There we held that testimony enhanced through hypnosis is admissible in a criminal trial if the trial court finds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory. If the testimony is admissible, the opponent may still challenge the reliability of the particular procedures followed in the individual case by introducing expert testimony at trial, *but the opponent may not attempt to prove the general unreliability of hypnosis.* [*Id.* at 543, 432 *A.*2d 86 (emphasis added).]

Furthermore, we are unable to see any real exculpatory difference between Perona's pre-and post-hypnotic statements. In neither statement did Perona establish that another person had been at the liquor store at the relevant time. Nor is there any indication that Perona's pre-hypnotic statement was more reli-

able. Although his two accounts of the time differed by thirty minutes, he mentioned in his first statement that 8:30 p.m. would be a rough estimation, and that he was "fuzzy" about the time. And although defendant may have been denied the use of Dr. Evans' testimony, he made full use of Perona's testimony about a suspicious man in the store that night, a man who did not fit defendant's description. In sum, the question of Perona's credibility was fully explored, and Doctor Evans' testimony was not necessary to test it. *See State v. Coruzzi,* 189 *N.J.Super.* 273, 302, 460 *A.*2d 120 (App.Div.) (true test of relevancy of evidence is logical connection of proffered evidence to fact in issue), *certif. denied,* 94 *N.J.* 531, 468 *A.*2d 185 (1983).

### 2.

Should Oliver Johnson's identification of the defendant have been ruled inadmissible because of improper suggestibility caused by the newspaper article in the Atlantic City Press?

█ Oliver Johnson met defendant for the first time at Helen Thompson's apartment. Eventually Johnson, Carmichael, and defendant gathered at Carmichael's apartment. While at Carmichael's apartment, Johnson stood no more than three or four feet from defendant. Because the lighting conditions in the apartment were good, Johnson had ample opportunity to observe defendant's physical characteristics. During the course of conversation, Carmichael introduced defendant to Johnson as "Joe Long's brother." Johnson also noticed a red jacket draped over an armchair, and was told by Carmichael that it was the defendant's.

Johnson left the apartment soon thereafter. Sometime later, as Johnson stood on the corner of Atlantic and Ohio Avenues waiting for a bus, he saw defendant pass by. Johnson also remembered that defendant was wearing the red jacket he had previously seen in Carmichael's apartment, as well as a red-and-white baseball cap. Days after the shooting, Johnson gave police a description of defendant and the red baseball jacket. He also said that he would be able to recognize defendant if he

saw him again. Weeks after the shooting, a photograph appeared in the Atlantic City Press as part of an article about the Compton and Carmichael shootings. Before he read any part of the article, Johnson noticed the photograph of defendant.

On October 4, 1985, the trial court conducted a *Wade* hearing, *see United States v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967), to determine whether Oliver Johnson's identification of the defendant was admissible. After hearing the foregoing facts, the court denied the motion to suppress the Johnson identification. Furthermore, the court found absolutely no impermissible suggestion on the part of the police or prosecutor's office with regard to defendant's picture in the newspaper. The court also ruled that it would permit Johnson to identify defendant in court, because Johnson testified that he recognized defendant from the three times he had seen him on the night of December 11, 1982, and not from the newspaper picture.

In *State v. Madison*, 109 *N.J.* 223, 536 *A.*2d 254 (1988), Justice Garibaldi set forth for the Court the guidelines for improper suggestibility. Using the "totality of the circumstances" analysis, a court must determine: (1) whether law-enforcement authorities used impermissibly-suggestive identification procedures; and (2) if the procedures were suggestive, whether they resulted in a "very substantial likelihood of irreparable misidentification." *Id.* at 232, 536 *A.*2d 254 (quoting *Simmons v. United States*, 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247, 1253 (1968)). With regard to the second part of the analysis, "the court [must] focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." *Ibid.* Furthermore, before our decision in *Madison*, we held in *State v. Farrow*, 61 *N.J.* 434, 451, 294 *A.*2d 873 (1972), *cert. denied*, 410 *U.S.* 937, 93 *S.Ct.* 1396, 35 *L.Ed.*2d 602 (1973), that impermissive suggestibility occurs only when "the circumstances lead forcefully to the conclusion that the identification

was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist."

Under the *Madison* and *Farrow* analyses, we do not find any impermissive or improper suggestibility arising from the authorities' release of defendant's picture to the local newspaper. There is no evidence that the police directed Johnson to look in the paper. Furthermore, Johnson gave the police a fairly accurate description of defendant as the man he saw in Carmichael's apartment shortly after the crime and long before the newspaper article and picture appeared. In light of the court's determination at the *Wade* hearing that Johnson could identify defendant from his prior personal meetings, without the need of the newspaper photograph, Johnson's identification was sufficiently reliable to admit into evidence. *See Madison, supra,* 109 *N.J.* at 239, 536 *A.*2d 254; *see also Neil v. Biggers,* 409 *U.S.* 188, 199, 93 *S.Ct.* 375, 382, 34 *L.Ed.*2d 401, 411 (1972) (reliability is determined by opportunity of witness to view criminal at time of crime, witness's degree of attention, accuracy of prior descriptions, level of certainty demonstrated, and length of time between crime and confrontation).

### 3.

Should the court have permitted expert testimony on the question of Oliver Johnson's identification of the defendant?

The trial court refused to permit the testimony of Dr. Robert Buckhout, a psychologist and expert in eyewitness identification, either at the *Wade* hearing or during trial. At the *Wade* hearing the court rejected the proffered testimony as irrelevant, saying that the only *Wade* issue was impermissible suggestibility of identification from the newspaper photograph. The court explained that the expert testimony, offered to show the inherent unreliability of identification from newspaper photographs, was irrelevant because even if the published newspaper photograph qualified as a police-identification procedure, only suggestibility, not credibility, was then at issue.

During his case in chief, defendant again offered expert testimony from Dr. Buckhout, relating to Johnson's eyewitness identification of defendant, based on its unique circumstances. The State agreed that the situation was unique, asserting that the expert testimony would therefore not be helpful because it would pertain to the fallibility of perception in the classic situations in which eyewitnesses glimpse a defendant at the crime scene and later make an identification at a line-up. Defendant argued that the same principles would apply as in classic situations, because Johnson testified that he had seen defendant three times, very briefly, on December 11, 1982, and because Johnson's newspaper identification was analogous to a show-up. The court excluded the testimony, finding that it failed to satisfy even the "liberal test" for admission of expert testimony set by the Third Circuit under federal rules. *See United States v. Downing*, 753 *F*.2d 1224 (3d Cir.1985) (admission of expert testimony, based on helpfulness standard, conditioned on two factors: (1) threshold balancing of scientific reliability and likelihood of prejudice, and (2) "fit" between scientific findings and facts of case); *Fed.R.Evid.* 702.

"The necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony, are judgments within the discretion of the trial court." *State v. Zola*, 112 *N.J.* 384, 414, 548 *A*.2d 1022 (1988). We find no abuse of discretion in the court's exclusion of Dr. Buckhout's testimony. Admission of expert testimony is limited by *Evidence Rule* 56(2), which allows such testimony "as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue." The Rule imposes three basic requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony. [*State v. Kelly*, 97 *N.J.* 178, 208, 478 *A*.2d 364 (1984).]

*See* Biunno, New Jersey Rules of Evidence (Anno.1990), Comment 5 to *Evid.R.* 56.

Here the testimony failed on the first prong of the *Kelly* test. The trial court stated that it did not question the expert's qualifications. Opinion of a qualified expert "may be presented to a jury if it will genuinely assist the jury in comprehending the evidence and determining issues of fact." *State v. Odom,* 116 *N.J.* 65, 70, 560 *A.*2d 1198 (1989). The proffered testimony was not clearly helpful to the jury's assessment of either the reliability of Johnson's eyewitness identification or the effect of his seeing defendant's photograph in the newspaper. Johnson's testimony was amply tested on cross-examination, and defendant failed to demonstrate that the subject matter (problems of eyewitness identification) was "beyond the ken of the average juror." *State v. Kelly, supra,* 97 *N.J.* at 208, 478 *A.*2d 364.

4.

Should the court have allowed the psychiatric examination of Alfred Carmichael to determine whether he was capable of telling the truth?

Prior to Carmichael's testimony, defendant sought an evidentiary hearing to determine whether Carmichael should be disqualified as a witness. Defendant alleged that Carmichael's speech was incomprehensible and that he had "some psychiatric problems." The court denied that motion, adding that if Carmichael presented any problem on the day he was to testify, the court would then hold a hearing to see if he was capable. Furthermore, defense counsel failed to renew the motion at the time of Carmichael's testimony. However, the court heard testimony from Carmichael's treating psychiatrist, who claimed that Carmichael no longer suffered from the problem of auditory hallucinations that he had experienced shortly after the shooting. Carmichael confirmed this during his own testimony.

Defendant now claims that the inconsistencies between Carmichael's pretrial statement in an interview with defense counsel and his testimony at trial support the contention that Carmichael was "mentally disturbed" and were more than

sufficient to pass the threshold test of *State v. R.W.*, 104 *N.J.* 14, 514 *A.*2d 1287 (1986), in which the Court held that there must be a "substantial need" before a psychiatric examination will be ordered to determine witness competency.

■ The general rule is that a competent witness is a qualified witness. *Evid.R.* 7. "The determination of whether a person is competent to serve as a witness lies within the discretion of the court." *State v. R.W.*, *supra*, 104 *N.J.* at 19, 514 *A.*2d 1287 (citing *State v. Butler*, 27 *N.J.* 560, 602, 143 *A.*2d 530 (1958); *State v. Gambutti*, 36 *N.J.Super.* 219, 223, 115 *A.*2d 136 (App. Div.1955)). The New Jersey Rules of Evidence also provide similar standards for determining witness competency:

> A person is disqualified to be a witness if the judge finds that (a) the proposed witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth. [*Evid.R.* 17, *quoted in State v. R.W.*, *supra*, 104 *N.J.* at 20, 514 *A.*2d 1287.]

In *R.W.* we emphasized that "the exercise of this power [to force a witness to submit to a psychiatric or psychological evaluation] is neither frequent nor common, and never lightly undertaken." 104 *N.J.* at 21, 514 *A.*2d 1287. The grant of such an evaluation demands "a substantial showing of need and justification" by the party seeking the evaluation. *Ibid.* (quoting *State v. Butler*, *supra*, 27 *N.J.* at 605, 143 *A.*2d 530). In *R.W.*, we provided examples that would satisfy the "substantial need" criterion for requiring a psychiatric examination: "[T]here must be a showing of some deviation from acceptable norms, such as an identifiable or clinical psychiatric or similar disorder, beyond the realm of those human conditions that ordinary experience would confirm as normal." *Id.* 104 *N.J.* at 22, 514 *A.*2d 1287. Although auditory hallucinations may be beyond the realm of normalcy, both the witness and the psychiatrist testified that the witness was no longer bothered by that problem. Furthermore, defendant offers no real evidence indicating how Carmichael's alleged disorder would affect the witness's competence or the court's ability to assess that com-

petence. As the Court held in *R.W.*, "absent persuasive evidence of potential incompetence, mere allegations of a disorder or unusual condition bearing upon competence do not constitute a sufficient showing to justify a psychiatric examination." *Id.* at 25, 514 *A.*2d 1287.

 Thus, the court properly denied defendant's motion for a psychiatric examination. The court correctly concluded that Carmichael did not suffer from any abnormality at the time of testifying. Although we have chosen to address this issue on the merits, defendant could also be deemed to have waived this claim, as he neglected to raise it on the eve of Carmichael's testimony in time for a hearing to be held.

### 5.

Did the court's instruction on the Gracco shooting unfairly characterize defendant's exculpatory evidence as a red herring?

 In a very brief portion of its charge to the jury, the court characterized the jury's responsibility as to "keep your eye right on the ball." It instructed the jury: "There are a few red herrings in this case. You know what I mean. Somebody drug [sic] a little something in front of you to get you off the scent. * * * You know, we get into that Gracco thing what not." It seemed, however, to be telling the jury to concentrate on what the State's burden is and what the State's burden is not. In other words, the State did not have to prove that the defendant had committed the Gracco shooting. It is true that ballistics evidence showed that Gracco was the third and final person shot with the gun used in the Carmichael and Compton shootings and that that was the strongest exculpatory evidence presented by the defense. But it is equally true that the State sought to prove that defendant could have been the perpetrator of the Gracco shooting in light of the evidence that he had changed his coat and gone back out on the night in question, albeit his motive for committing a third robbery would be somewhat unreasonable. The court attempted to cure the

charge and regretted the use of the expression, but felt on the whole that it had not prejudiced the jury. We agree.

### 6.

Was there insufficient evidence to justify a flight charge?

This issue involves another discretionary ruling. Flight of an accused is admissible as evidence of consciousness of guilt, and therefore of guilt. *State v. Johnson,* 216 *N.J.Super.* 588, 612, 524 *A.*2d 826 (App. Div.1987) (quoting *United States v. Ballard,* 423 *F.*2d 127 (5th Cir.1970)). Mere departure, however, does not imply guilt. *State v. Sullivan,* 43 *N.J.* 209, 238, 203 *A.*2d 177 (1964), *cert. denied,* 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.*2d 477 (1966). Flight requires departure from a crime scene under circumstances that imply consciousness of guilt. *Ibid.* There is a thin line in some cases between the defendant's right to presumed innocence and the right of a jury to infer guilt from conduct. Here the court charged the jury that if it found that defendant fled, it might infer from the flight a guilty state of mind. The charge presented a totality-of-the-circumstances test, and did not suggest that departure alone implied guilt. The court charged:

I want to tell you about flight, because there has been some testimony in the case * * * from which you may infer that the defendant was avoiding apprehension. Now, you may feel that he was not. And if he was not, then fine. You may feel that he was. If you feel that he was, then you have to stop and think if he was doing that in order to avoid apprehension and was it from a consciousness of guilt. Or was it just because he was afraid or had something else to do. But the point is, again, that there's a principle of law that says that you may, if you find he, in fact, was fleeing, infer from that a consciousness of guilt because all along, not only are you going to be assessing credibility, but when you get into deciding the individual counts, you're going to have to ascertain in your own mind what the defendant's state of mind was. * * * You define a person's state of mind from everything that you see and hear and the circumstances in which a given set of events occurs. Enough said. That's flight.

The facts were marginally sufficient to support a flight charge. Defendant testified that he had gone to New York even though he knew he was wanted by the Atlantic City police. Knowing he was wanted, he failed to turn himself in

for two weeks. *See State v. Johnson, supra,* 216 *N.J.Super.* at 613, 524 *A.*2d 826 (two-week-long failure of suspect to report to police is fair comment on issue of consciousness of guilt). Two witnesses testified to defendant's furtive and nervous behavior in the days following the crime. However, other evidence contradicted an inference of flight. Defendant remained in Atlantic City for a few days after the shooting, visited a New Jersey prison on December 18, 1982, and voluntarily surrendered. Such evidence does not necessarily require omission of a flight charge, but does require reflection in the charge that flight is just a circumstance tending to show consciousness of guilt. *State v. D'Amato,* 26 *N.J.Super.* 185, 187–88, 97 *A.*2d 741 (App.Div.1953). The flight charge adequately conformed to that requirement.

## 7.

Should Herron Pate's testimony have been excluded because it was not revealed to the defense until two days before trial?

Based on surprise, defendant sought the exclusion of Herron Pate's testimony or in the alternative a continuance. Although the State had supplied her name in discovery, there had been no suggestion that defendant had confessed to her. But as noted in the statement of facts, Herron Pate did not give police the "confession" information until two days before trial. At trial she explained that she had waited in hope that defendant would plead guilty. When she did inform police, the State immediately notified the defense, made the witness available for an interview, and agreed to a day's adjournment to allow defense additional preparation time. Based on those facts we find no abuse of discretion in the trial court's admission of the testimony.

## 8.

Did the trial court err in limiting defendant's cross-examination of Pettigrew, and in allowing the prosecution to use certain documents in its redirect examination of Pettigrew?

During cross-examination of the witness Pettigrew, defendant sought to establish that the two men were not close, and that it was unlikely defendant would confide in him. On redirect, the State had Pettigrew review twenty-six letters between him and defendant, most of which involved defendant's giving legal advice to Pettigrew. Much of the correspondence included defendant's suggestions to Pettigrew that he "lie" to beat the charges against him. The State never sought to admit those letters as evidence; it used only portions of the letters to refresh Pettigrew's recollection. The State's intention in using those excerpts was, in its own words, to "expose the depth of the friendship between the two men." Defendant now contends that the letters served only to inflame the jury against him, and were improperly used by the prosecution. Defendant also argues that the trial court unfairly limited his cross-examination of Pettigrew.

In neither of these instances do we find any abuse of judicial discretion. Although the letters did have a prejudicial effect on defendant's case—they exposed defendant as encouraging Pettigrew to lie—they also had significant probative value in demonstrating the continued correspondence between Pettigrew and defendant. Furthermore, with regard to defendant's second argument, we have held that the scope of cross-examination rests in the sound discretion of the trial court. *State v. Petillo*, 61 *N.J.* 165, 293 *A.*2d 649 (1972), *cert. denied*, 410 *U.S.* 945, 93 *S.Ct.* 1393, 35 *L.Ed.*2d 611 (1973). We discern no examples in which the trial court abused its discretion with regard to defendant's cross-examination of Pettigrew.

## V

### Other issues.

For completeness of the record and preservation of the issues, we note the points raised by the defendant that were decided in *Ramseur* and *Biegenwald*, specifically defendant's continuing challenge to the constitutionality of the death penal-

ty in New Jersey, both on its face and as applied, and, in particular, consideration of felony murder, both as an aggravating factor and a lesser-included offense of murder; the constitutionality of death-qualification of juries; and the order of opening and closing statements. We have considered whether any departure should be made from our prior rulings on these issues and have concluded that no departure is justified.

We have considered various other issues raised by defendant and find no error. The court's guilt-phase charge sufficiently conveyed to the jury its duty to attempt to reach a unanimous verdict without sacrificing any individual beliefs. The penalty-phase charge on unanimity sufficiently explained to the jury that a non-unanimous verdict would result in a sentence of no less than thirty years.

Defendant contends that a 1985 simple-assault conviction should have been excluded during the penalty phase because character testimony presented by the defense in mitigation concerned only events before 1983, and the State's rebuttal should be restricted to the same time frame. Neither case law nor Court Rules requires such limitation.

Defendant also contends that letters written on his behalf should have been admitted during the penalty phase. Although the technical rules of evidence do not bind defendant in the penalty phase, any proofs submitted should be subject to cross-examination by the State. *State v. Rose, supra,* 112 *N.J.* at 502–03, 548 *A.*2d 1058. In light of the availability of character witnesses, thirteen of whom actually testified, the court did not error in excluding the letters.

Defendant also claims court partiality and juror misconduct. Although we do not believe that the court improperly "praised the jury" for its performance in the guilt phase, as defendant charges, we note that the. issue is mooted by our disposition. Similarly mooted is the question of whether a juror's facial expressions during testimony by character witnesses in the penalty phase warranted mistrial of that phase.

Our disposition of this case makes it unnecessary to undertake the proportionality review requested by defendant under *N.J.S.A.* 2C:11–3e. We note that the various County Prosecutors, in consultation with the Attorney General, have adopted guidelines for use throughout the State in determining the selection of capital cases. ↘ *See State v. Koedatich*, 112 *N.J.* 225, 258, 548 *A.*2d 989 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989).

■ Any retrial *voir dire* will be conducted in accordance with standards set forth in *State v. Bey (II)*, 112 *N.J.* 123, 149–55, 548 *A.*2d 887 (1988), and *Williams, supra*, 113 *N.J.* at 408–36, 550 *A.*2d 1172. Any comments made by the prosecutor in summation will be measured on remand in light of the evidence offered in any retrial, according to standards in *Bey II, supra*, 112 *N.J.* at 166, 548 *A.*2d 887, and *Williams, supra*, 113 *N.J.* at 446–56, 319 *A.*2d 217. The prosecutor's questioning of Leslie DeVault regarding defendant's having assaulted a jail guard will be handled by the standards set forth in *State v. Rose, supra*, 112 *N.J.* 454, 548 *A.*2d 1058—that is, cross-examination of DeVault and defendant's other character witnesses must be limited to rebutting proffered evidence of good character. *Id.* at 503, 548 *A.*2d 1058. The trial court should rule in advance, outside the presence of the jury, on the permitted scope of the contemplated cross-examination of defendant's character witnesses. *Id.* at 503–04, 548 *A.*2d 1058 (citing *Evid.R.* 8). Other collateral evidence developed in the penalty phase will be subject to the limited uses set forth in *State v. Rose*. The trial court's failure to instruct the jury on the role of sympathy in its penalty-phase deliberation has been covered in our decision in *Bey II, supra*, 112 *N.J.* at 171–72, 548 *A.*2d 887. On remand the jury's deliberation shall conform to the standards set forth in *Bey II, id.* at 155–181, 548 *A.*2d 887. Finally, the lack of a specific finding that death is the appropriate punishment was not error. *Ramseur, supra*, 106 *N.J.* at 316 n. 80, 524 *A.*2d 188.

To sum up, the conviction of murder under Count Eleven of the indictment does not establish death-eligibility under the principles of *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792. If the defendant is to be sentenced to death, "the guilt phase of the capital murder charge must be retried from the beginning." *Id.* at 92, 549 *A.*2d 792. In all other respects the judgment below is affirmed. Consideration of excess sentence challenges on the non-capital counts will await the further proceedings in the Law Division. Defendant's appeal and the State's cross-appeal covering the merger of the weapons counts shall await disposition after remand.

Defendant's notice of appeal to us under *Rule* 2:2–1(a)(3) refers only to the capital-murder conviction, the count as to which there is an appeal of right. Because there is no realistic way to bifurcate such an appeal (*e.g.,* appeal some counts to the Appellate Division, other counts to this Court), we have treated the appeal as embracing the other counts of the indictment. In future capital appeals, the notice of appeal should refer to other counts contested on appeal.

A question may arise on remand whether reversal of the capital murder count, Count Eleven, requires reversal of any other related count prior to retrial of Count Eleven. Generally, when error relates only to separable issues, a judgment may be reversed in part, and in criminal cases counts may be selectively reversed. 5 *Am.Jur.*2d, Appeal and Error § 953 p. 380 (1962); *see, e.g., State v. Theriault,* 182 *Conn.* 366, 374, 438 *A.*2d 432, 440 (1980) ("In a proper case where the error relates only to separable issues covered by the judgment, and the issues are not so interwoven that justice demands a new trial of the entire case, the case may be reversed as to those separable issues only."). See also *People v. Leverette,* 112 *Mich.App.* 142, 315 *N.W.*2d 876 (1982), which held that although a related count may not be tainted by error, retrial of a reversed count may require vacation of the valid count if the jury is given only a fractional version of the criminal episode. The Michigan

court stated: "On the facts of this case, the jury is unlikely to want to acquit defendant entirely. If [the count affirmed] is not offered as a possible verdict, it is inherently likely that the jury would convict defendant of robbery even if it believed his story concerning what happened." *Id.* at 157 n. 10, 315 *N.W.*2d at 884 n. 10. Absent such prejudice our criminal case law has been in accord with the general principle of selective or partial reversal. *See, e.g., State v. Smith,* 210 *N.J.Super.* 43, 509 *A.*2d 206 (App.Div.) (reversing and remanding felony murder conviction but sustaining other related counts including armed robbery), *certif. denied,* 105 *N.J.* 582, 523 *A.*2d 210 (1986); *State v. Darby,* 200 *N.J.Super.* 327, 491 *A.*2d 733 (App.Div.1984) (reversing and remanding attempted murder conviction but sustaining other related counts including robbery and aggravated assault), *certif. denied,* 101 *N.J.* 226, 501 *A.*2d 905 (1985). It is not clear how the rule should be applied to the bifurcated trial of a capital case, however, when an underlying offense, such as the liquor-store robbery here, serves as the aggravating factor that is akin to an "essential element" of an offense in establishing death eligibility. *State v. Biegenwald, supra,* 106 *N.J.* at 59–60, 524 *A.*2d 130.

In this case the parties have neither briefed nor argued the issue. The parties are free to make supplemental application to this Court for early resolution of disputed issues.

## VI

We reverse defendant's capital-murder conviction, vacate the death sentence, and remand to the Law Division for further proceedings in accordance with this opinion.

## APPENDIX

A chronological listing of the relevant events between defendant's arrest and the commencement of trial:

Jan. 7, 1983—Defendant surrendered in Philadelphia to face Pennsylvania charges.

Aug. 24, 1983—Defendant transferred to New Jersey.

Aug. 26, 1983—Original indictment returned against defendant.

Dec. 23, 1983—Trial court ruled on defendant's pretrial motions. At this time the State was ready to proceed, but defense counsel requested additional time for preparation and to file interlocutory appeals.

May 21, 1984—Jury selection commenced.

June 27, 1984—Defendant filed motion challenging the jury selection process in Atlantic County.

July 7, 1984—Defendant expressly waived speedy trial claim to pursue jury challenge.

Jan. 7, 1985—Trial court sustained jury challenge and dismissed indictment.

Apr. 2, 1985—Superseding indictment returned.

Apr. 17, 1985—Substitution of defense counsel occasioned by conflict due to same public defender having represented both Pettigrew and defendant.

May 3, 1985—Speedy trial motion heard. Defense counsel requested a future trial date due to his late entry into the case.

Sept. 5, 1985—Jury selection commenced.

HANDLER, J., concurring in part and dissenting in part.

Defendant, Ronald Long, was prosecuted for killing a liquor store clerk during the course of a robbery. Defendant was convicted of capital murder and was sentenced to death. The Court reverses the conviction and death sentence and remands the case for retrial. I concur in this result.

I believe there are other grounds, in addition to those relied on by the majority, to base reversal of the conviction and vacation of the sentence. Those concern the trial court's improper limitation of the *voir dire* on racial prejudice; the improper handling and use of evidence of other crimes primarily through prejudicial joinder of charged crimes; the improper exclusion of expert opinion relating to hypnotically-induced testimony; improper comments in the trial court's charge to the jury with respect to defendant's evidence and defenses; and prosecutorial misconduct on summation in mischaracterizing defendant's legal challenge to the Atlantic County jury-selection process. Further, I remain of the view that the Capital Murder Act is unconstitutional as enacted, construed, and applied, and would reverse on those grounds as well. *See State v. Di Frisco*, 118 *N.J.* 253, 284, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part).

## I.

Defendant in this case is black, the victim white. The existence of racial discrimination in the administration of the State's capital-murder death-penalty statute is an issue we noted and addressed on the first occasion of this Court's consideration of the constitutionality of the death-penalty statute. *See State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987). The Court has not come to grips with the problem since, and in this case the Court ignores the issue. I believe the case inescapably presents the issue of race discrimination in capital-murder prosecutions, and the Court should confront that issue directly. This record impels the conclusion that the jury impanelled in this case was not examined sufficiently in terms of potential racial bias, and that, constitutionally, defendant should not have been tried, convicted, and sentenced to death by this jury.

The trial court required each potential juror to complete a questionnaire outlining a number of subjects, including his or her occupation, familiarity with the case, experience with the criminal justice system, and the like. Thereafter, the court questioned each potential juror individually on the basis of the responses to the written questionnaire as well as on each juror's opinion of the death penalty. The court also permitted counsel to ask additional questions of each juror.

Defense counsel objected to the use of the questionnaire, citing the inability to observe demeanor. Unsuccessful, defense counsel submitted a number of proposed questions to be incorporated. Many of those proposed questions attempted to reveal racial bias. The trial court denied all of the suggested questions except one; it was the *one* racial question already contained in the questionnaire:

Would the fact that the defendant is black and one of the victims is white affect or influence your judgment in this case?

Four jurors answered "yes" to that question and were questioned further on the subject during live *voir dire*. Three jurors were excused for cause because of racial bias against

blacks, a fourth was excused for racial bias in favor of blacks. Another juror, who did not answer the question affirmatively, was nonetheless excused for racial bias against blacks as a result of his views expressed during *voir dire*.

Defendant argues that his rights to trial by an impartial jury and to due process were violated by the trial court's limitation of questioning on the subject of racial prejudice to a single written question. Defendant points out that in capital cases such as this, where the homicide victim is white and the defendant black, it is especially necessary to guard against latent as well as overt racial prejudice. The single question was flawed not only in its limited scope, but, because it was in written form, it prevented defense counsel from observing the demeanor of venirepersons, thus making intelligent challenges for cause and peremptory challenges impossible. Defendant further asserts that this problem could have been avoided if the trial judge had incorporated some of defendant's questions into the live *voir dire*.

In *Ristaino v. Ross*, 424 *U.S.* 589, 96 *S.Ct.* 1017, 47 *L.Ed.*2d 258 (1976), a black defendant was convicted of violent crimes against a white security guard. The trial court denied the defendant's request to *voir dire* potential jurors on racial prejudice. The Supreme Court held that the simple fact pattern of a white victim of a violent crime at the hands of a black assailant did not give rise to a constitutional requirement that the court question the jury concerning racial prejudice. *Id.* at 597–98, 96 *S.Ct.* at 1021–22, 47 *L.Ed.*2d at 265. That stark factual pattern contrasted with the facts of *Ham v. South Carolina*, 409 *U.S.* 524, 93 *S.Ct.* 848, 35 *L.Ed.*2d 46 (1973), which implicated the "special circumstances" in which the Constitution does require a question on racial prejudice. *Ham* involved a black defendant charged with a drug offense. His defense was that the law-enforcement officers had "framed" him in retaliation for his active, and widely known, participation in civil-rights activities. "The critical factor present in *Ham*, but not present in *Ristaino*, was that racial issues were 'inex-

tricably bound up with the conduct of the trial,' and the consequent need, under all the circumstances, specifically to inquire into possible racial prejudice in order to assure an impartial jury." *Rosales–Lopez v. United States,* 451 *U.S.* 182, 189, 101 *S.Ct.* 1629, 1634, 68 *L.Ed.*2d 22, 29 (1981) (quoting *Ristaino v. Ross, supra,* 424 *U.S.* at 596, 96 *S.Ct.* at 1021, 47 *L.Ed.*2d 258). The lesson of *Ristaino* is that a violent, interracial crime committed by a minority defendant does not constitute a "special circumstance" that constitutionally requires inquiry into possible racial prejudice.

Nevertheless, that very fact pattern, with nothing more, does require a federal court to inquire into racial prejudice on *voir dire* under the Supreme Court's supervisory power over the federal courts. In *Rosales–Lopez v. United States, supra,* the Supreme Court formulated a nonconstitutional standard that required federal trial courts to make such an inquiry when requested by a defendant accused of a violent crime, where the defendant and the victim are members of different racial or ethnic groups. 451 *U.S.* at 192, 101 *S.Ct.* at 1636, 68 *L.Ed.*2d at 31. Such circumstances indicate that there is a "reasonable possibility that racial or ethnic prejudice might have influenced the jury," and refusal to honor the defendant's request constitutes reversible error. *Id.* at 191, 101 *S.Ct.* at 1636, 68 *L.Ed.*2d at 30.

In *Turner v. Murry,* 476 *U.S.* 28, 106 *S.Ct.* 1683, 90 *L.Ed.*2d 27 (1986), the Supreme Court held that a defendant in a *capital* case involving an *interracial* crime is *constitutionally* entitled to have prospective jurors informed of the race of the victim and questioned on racial bias. That was not a retreat from *Ristaino;* the Court merely held that the fact that the case involved a capital sentencing proceeding before a jury constituted a "special circumstance" of constitutional proportions. "Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." *Id.* at 35, 106 *S.Ct.* at 1687, 90 *L.Ed.*2d at 35. Such risk is especially serious

in light of the complete finality of the death sentence. *Ibid.* Thus, unlike *Ristaino*, which involved an interracial, violent, but noncapital crime, the capital sentencing proceeding of *Turner* constituted a "special circumstance" that compelled *voir dire* on racial prejudice.

Thus, under *Turner*, the trial court in this case was, indeed, constitutionally compelled to inquire into the racial bias of potential jurors on *voir dire*. Moreover, our own state-constitutional protections directed against racial bias that can undermine the impartiality of a jury in a capital murder case are more exacting:

> Under our State constitution, as a matter of fundamental fairness, [a capital] defendant [is] entitled to have procedures invoked that [will] maximize his [or her] right to be tried by a fair and impartial jury. New Jersey has always evinced exceptional concern with the evils of racial prejudice, as exemplified by the State's many strong prohibitions against discrimination. *See, e.g., N.J. Const.* of 1947 art. I, para. 5; *N.J.S.A.* 10:5–3 (law prohibiting discrimination); *N.J.S.A.* 2A:72–7 (establishing criminal penalties for disqualifying a person from jury service on account of race). Moreover, this Court has consistently confirmed the right of a criminal defendant to a fair and impartial jury as a matter of State constitutional jurisprudence. *E.g., State v. Ragland,* 105 *N.J.* 189 [519 *A.*2d 1361] (1986); *State v. Ingenito,* 87 *N.J.* 204 [432 *A.*2d 912] (1981). We have given this constitutional right added force in terms of providing a criminal defendant with a trial free of racial bias. *E.g., State v. Gilmore, supra,* 103 *N.J.* 508 [511 *A.*2d 1150]. [*State v. Ramseur, supra,* 106 *N.J.* at 426, 524 *A.*2d 188 (Handler, J., dissenting).]

In *Ramseur*, this Court upheld the trial court's asking of a single question regarding race in open court in a case involving a black defendant and a black victim. In acknowledging the rule of *Turner*, the *Ramseur* Court noted: "In the instant case, by contrast, not only was there no interracial crime involved, but the trial court *did* allow a question on race analogous to the one refused by the trial court in *Turner* ... [Also] racial issues in the present case were not 'inextricably bound up with the conduct of the trial.'" *Id.* at 245–46, 524 *A.*2d 188 (citation omitted). The Court further noted

> that where the case itself carries no racial overtones, racial concerns are met by the approach followed by the trial court in the instant case although, where defendant so requests, we would prefer a broader range of inquiry. We reject the defendant's characterization of the allowed question as a "sledgehammer"

inquiry. By allowing a general inquiry into whether racial views would affect impartiality, and by leaving open the possibility of further questioning if the initial answer warranted it, the trial court responded to the general problem of racially prejudiced jurors. *Because the case itself carried no racial overtones, there was no abuse of discretion in so limiting the questioning;* nor would there have been abuse in allowing more extensive questioning. Under the circumstances in this case, the trial court's approach cannot be said to have deprived defendant of his right to an impartial jury, even if a more searching inquiry is usually advisable when requested. [*Id.* at 247–48, 524 *A.*2d 188 (emphasis added).]

In contrast to *Ramseur*, the case now before this Court does "carry racial overtones" because it involves a black defendant and a white victim. *See, e.g., State v. Sims,* 140 *N.J.Super.* 164, 355 *A.*2d 695 (App.Div.1976), *cited in State v. Ramseur, supra,* 106 *N.J.* at 246–47, 524 *A.*2d 188, as an example of a case with "racial overtones" because it involved an interracial crime. Furthermore, this Court has recently stated that "the absence of racial overtones does not obviate the need to consider whether a more expansive *voir dire* should be conducted." *State v. Williams (Williams II),* 113 *N.J.* 393, 428, 550 *A.*2d 1172 (1988). Although *Williams II* involved a capital murder of a black woman by a black defendant, the Court noted that racial bias could still play a role:

Racial prejudice may be either blatant and easy to detect or subtle and therefore more difficult to discern. A probing *voir dire* that elicits more than a "yes" or "no" response will aid the trial court in excusing prospective jurors for cause and will assist the defense in exercising its peremptory challenges. When the defendant is a member of a cognizable minority group, a more searching *voir dire* should be conducted, if requested. [*Ibid.* (citations omitted).]

In this case, clearly one marked by racial overtones, the inquiry was less searching than that conducted by the trial court in *Ramseur*. This fact, taken together with the holding of *Williams II, supra,* 113 *N.J.* 393, 550 *A.*2d 1172, which requires that "where the defendant is a member of a cognizable minority group, a more searching *voir dire* should be conducted, if requested," indicates that the trial court in this case should have conducted a more searching *voir dire* into the issue of

racial bias. The failure to have done so constituted a violation of the defendant's right to due process and an impartial jury.[1]

We are thus confronted with constitutional error. I believe that under the appellate-review standard of *State v. Bey (Bey I)*, 112 *N.J.* 45, 94–95, 548 *A.*2d 846 (1988), there must be a reversal. The *Bey I* Court stated that the test is "whether the error was clearly capable of affecting the verdict" except in the event of a constitutional violation, which by its "very nature cast(s) so much doubt on the fairness of the trial process that, as a matter of law, [it] can never be considered harmless." 112 *N.J.* at 94–95, 548 *A.*2d 846 (citing *Satterwhite v. Texas*, 486 *U.S.* 249, 256, 108 *S.Ct.* 1792, 1799, 100 *L.Ed.*2d 284, 293 (1988). "Even in a case ... where the evidence of guilt is compelling, the right to a fair trial must be diligently protected to insure

---

[1]It is also appropriate to note that the empirical evidence strongly supports the premise that invidious racial overtones are otherwise implicated in an interracial capital murder. Defendant points out that the statistics contained in the Public Defender's *Preliminary Report* indicate that the race of the victim improperly affects the decision to prosecute a particular homicide as a capital case. In the subsequent published version of that report, the authors claim that

> [t]he results reported here indicate clear and significant discrepancies in the treatment of potentially capital cases when cases were differentiated by race of defendant and victim and county of jurisdiction. These county and race effects persisted even after the logistic regression analysis took into account over one hundred potential explanatory variables, such as the defendant's prior record and the presence of a contemporaneous offense. In the opinion of the authors, this statistical evidence is sufficiently compelling to shift the burden to the State to come forward with evidence that the system of selecting cases for capital prosecution does not operate in a manner which offends constitutional principles.
>
> [Bienen, Weiner, Denno, Allison & Mills, "The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 *Rutgers L. Rev.* 27, 327 (1988).]

Although this Court expressly considered and rejected the sufficiency of the statistical evidence to support the claim of arbitrary prosecutorial discretion in capital-murder prosecutions in *State v. Koedatich*, 112 *N.J.* 225, 257, 548 *A.*2d 939 (1988), that evidence nonetheless confirms the conclusion reached earlier by the Court in *Ramseur* that potential racial bias is implicated in an interracial capital-murder case and can imperil a fair trial.

that all defendants, regardless of the crime charged or the weight of the evidence produced, are tried by a fair and impartial jury." *Williams II, supra,* 113 *N.J.* at 409, 550 *A.*2d 1172.

Potential racial bias was indisputably implicated in this case. Defendant expressly sought to examine jurors with respect to such bias. The court's refusal to screen more carefully the prospective jurors contravenes the self-evident principle that death-penalty prosecutions are "the categorical imperative for trial fairness." *State v. Williams (Williams I),* 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983). Because the failure of the trial court to conduct a more searching *voir dire* into racial bias was a violation of defendant's constitutional rights to an impartial jury and due process under *Turner, supra,* defendant's conviction should be reversed and the cause remanded for a new trial.

## II.

Another serious issue in this case relates to the use of other-crimes evidence. Such evidence can be presented in different forms and can arise in different settings. In *State v. Pennington,* 119 *N.J.* 547, 575 *A.*2d 816 (1990), for example, it arose in the form of evidence of other uncharged crimes proffered under *Evidence Rule* 55 and of prior convictions admitted under *State v. Sands,* 76 *N.J.* 127, 386 *A.*2d 378 (1978). Here, such evidence is presented in the context of the joinder of other crimes in the indictment.

The original and superseding indictments in this case consisted of several counts relating to three different criminal episodes: the Compton homicide, the Carmichael shooting, and miscellaneous offenses relating to the stolen gun and ammunition. Prior to trial, defendant moved to sever the three groups of charges. The trial court denied the severance motions. Defendant now maintains that the guilt phase was infected with prejudice by the trial of all these crimes together. He further contends that not severing those different counts aug-

mented this prejudice in the penalty phase because, "when the prosecutor asked the jury to impose the death penalty on the basis of the Compton homicide, the jury had already found defendant guilty of unrelated crimes based on evidence which clearly fell outside the scope of evidence to be considered in a penalty phase." Thus, defendant submits that the denial of his severance motion prejudiced his right to a fair trial in both phases of the trial and, accordingly, requires reversal of both sentence and conviction. I agree with this position.

This Court has dealt with the issue of whether the noncapital counts in an indictment should be severed from the capital counts in *State v. Moore*, 113 *N.J.* 239, 550 *A.*2d 117 (1988), and *State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989). The initial inquiry in determining whether the trial court abused its discretion in denying a severance motion is whether the challenged counts could properly be joined in the same indictment with the homicide counts under *Rule* 3:7–6. *State v. Pitts, supra,* 116 *N.J.* at 601–02, 562 *A.*2d 1320; *State v. Moore, supra,* 113 *N.J.* at 273, 550 *A.*2d 117. That Rule provides:

> Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common plan. Relief from prejudicial joinder shall be afforded as provided by R. 3:15–2.

The requirements of *Rule* 3:7–6 are met in this case because there is a connection between the three separate categories of counts, but *Rule* 3:7–6 itself authorizes relief from joinder under *Rule* 3:15–2(b), which expressly provides that if, for any other reason, it appears that joinder of offenses charged in the indictment prejudices defendant, "the court may order an election of separate trials of counts."

The standard that is frequently invoked to determine if prejudice exists from joinder of multiple offenses is whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would otherwise be admissible under *Evidence Rule* 55 in the trial of the remaining charges.

*State v. Pitts, supra,* 116 *N.J.* at 601–02, 562 *A.*2d 1320; *State v. Moore, supra,* 113 *N.J.* at 274, 550 *A.*2d 117. *Evidence Rule* 55 expressly permits proof of other-crimes evidence to prove other facts genuinely in issue "including motive, intent, plan, knowledge, identity, or absence of mistake or accident." Nevertheless, this *Rule* also expressly precludes the admission of evidence of other crimes to prove defendant's propensity toward criminal conduct. This in turn involves a critical and conscientious analysis and weighing of the probative and prejudicial aspects of the evidence under *Evidence Rule* 4.

In this case, it is not enough to show that the evidence relating to the noncapital crimes was probative with respect to guilt of the Compton murder. Unquestionably it was probative. *Ante* at 473, 575 *A.*2d at 452. Under *Evidence Rule* 55 and *Evidence Rule* 4, the court must go further and determine the existence of potential prejudice, and weigh the prejudice against the probative worth of the evidence. Because "other-crime evidence has a unique tendency to turn a jury against the defendant," *State v. Stevens,* 115 *N.J.* 289, 302–03, 558 *A.*2d 833 (1989), that weighing process is particularly critical in a capital-murder prosecution. Such proof offered in the guilt phase of a capital-murder trial has an "evidentiary fallout" that can taint not only the jury's determination of guilt but also its determination of life or death. *See State v. Pennington, supra,* 119 *N.J.* at 599, 575 *A.*2d 816 (Handler, J., concurring in part and dissenting in part).

In this case, the evidence relating to the Carmichael shooting carried extraordinary prejudicial potential. It had the inherent capacity to demonstrate defendant's evil propensities in connection with the capital-murder charge, and, furthermore, it was used to prove a *charged* crime rather than an *uncharged* crime. The jury had to determine not only its probative worth but also whether, beyond a reasonable doubt, it independently justified a determination of ultimate guilt for the Carmichael shooting. Thus this evidence, even as bearing on guilt for the Compton murder, took on enormous evidential weight, well beyond what

it might otherwise have had if it had been admitted only as an uncharged crime under *Evidence Rule* 55 to be used solely to prove an ancillary fact such as intent or motive. In the context of the prosecution for capital murder, other crime evidence that also constitutes proof of a separate homicidal assault is singularly harmful. It has all of the evidentiary impact of a prior conviction, which, in a capital-murder prosecution, can be devastating. "The prejudice is self-evident, inescapable, and destructive." *State v. Pennington, supra,* 119 *N.J.* at 606, 575 *A.*2d 816 (Handler, J., concurring in part and dissenting in part).

The trial court instructed the jury in its determination of penalty that the only aggravating factor it could consider during the penalty phase was that the murder was committed during the course of a robbery. That instruction, however, in no way required the jury to disregard, discount, or otherwise limit the noncapital offenses it had previously found defendant guilty of. *State v. Pitts, supra,* 116 *N.J.* at 603, 562 *A.*2d 1320; *State v. Moore, supra,* 113 *N.J.* at 276–77, 550 *A.*2d 117 (holding that penalty-phase jury should be instructed that other counts are not aggravating factors). The court's instruction did not overcome the substantial prejudice engendered by the evidence of the other-charged crimes.

Those several considerations underscore the need in a capital-murder prosecution to require that any *Evidence Rule* 4 hearing to determine the admissibility of other-crimes evidence—other uncharged crimes, other charged crimes, and other prior convictions—must take into account not only the prejudicial effect on the determination of guilt but also the prejudicial effect on the determination of sentence. *See State v. Pennington, supra,* 119 *N.J.* at 585–87, 575 *A.*2d 816. The court must, in the guilt-phase of a capital-murder prosecution, I submit, bring into the equation a consideration of the prejudice such evidence can have in terms of arousing, inflaming, or confusing a jury in its critical assessment of aggravating and mitigating

factors, and in terms of the capacity of such evidence to mark defendant as an evil, violent and dangerous person.

These considerations also bring into clear focus the need to ensure wholly separate guilt and penalty phases of capital-murder trials. In a case such as this there is simply no effective means to protect the penalty phase from the prejudicial taint of other-crimes evidence other than to impanel separate juries. In *State v. Moore, supra,* this Court stated that "if the trial court believes that proper limiting instructions are not sufficient to protect the defendant from prejudice that would result from the joinder of the offenses, then the trial court must either grant defendant's motion for severance of the indictment or impanel a new jury for the penalty phase." 113 *N.J.* at 277, 550 *A.*2d 117.

Defendant contends that the trial court improperly denied his motion for a second jury for the penalty phase. He maintains that a second jury was required because evidence relating to the Carmichael shooting and handgun charges, which were tried together with the Compton homicide, was plainly inadmissible in the penalty phase and prejudicial to a fair adjudication of the penalty. This case clearly warranted that relief.

In *State v. Hunt,* 115 *N.J.* 330, 396–403, 558 *A.*2d 1259 (1989) (Handler, J., dissenting), I stressed the need to provide an alternative to the current bifurcated-trial scheme, which consists of a sequential trial of guilt and penalty that does not effectively separate the two proceedings. I noted alternatives to the death-qualification procedure employed *de rigeur* in current practice. *Id.* at 396–403, 558 *A.*2d 1259. I pointed out that the multiple-jury procedure, under which separately impanelled juries have separate responsibilities, can be adapted to the trial of a capital-murder case. *Id.* at 396, 558 *A.*2d 1259. This proposal was also considered by the Supreme Court's Committee on Criminal Practice. 125 *N.J.L.J.* 85–86. There are other alternatives. A number of state-statutory schemes provide that after a jury trial on guilt in capital cases, where the penal stakes are the highest, the court alone imposes sentence. Some

states permit the trial court to override the sentencing verdict of the jury. *Id.* at 404 n. 4, 558 *A.*2d 1259. In our own state, our statute authorizes the court "for good cause" in a capital case to discharge the jury that presided at trial and empanel a new jury for the penalty phase. *N.J.S.A.* 2C:11–3(c)(1).

There are several objections to trials before separate juries to determine the sentence for capital murder. They include juror accountability, nullification, and residual doubt, *see State v. Hunt, supra,* 115 *N.J.* at 399–402, 558 *A.*2d 1259. In my opinion these concerns do not severally or collectively overcome greater evils exemplified by the use of highly prejudicial evidence that can affect the determination of life or death or, for that matter, by the use of death-qualified juries to determine guilt. *Id.* at 392, 558 *A.*2d 1259. The asserted inconvenience of impanelling a second jury or the use of a multiple-jury bifurcated system has to do more with physical and financial demands than procedural complexity. Such considerations cannot outweigh constitutional interests. *See, e.g., Ballew v. Georgia,* 435 *U.S.* 223, 98 *S.Ct.* 1029, 55 *L.Ed.*2d 234 (1978). We should, I believe, heed Justice O'Hern's observation in a previous decision that "[o]urs is a civilization uniquely committed to the value of human life. Our nation does not view the lives of its citizens as easily expendable. We do not measure the value of human life in dollars." *State v. Ramseur, supra,* 106 *N.J.* at 342, 524 *A.*2d 188 (O'Hern, J., concurring). "The real question for us is not what the State can do, but rather what we should do in the just exercise of our common law supervisory power over criminal practice within our jurisdiction." *Id.* at 333–34, 524 *A.*2d 188.

## III.

Related to the errors surrounding the admissibility and use of the evidence of the other crimes arising out of the Carmichael incident is that involving another criminal incident, the Gracco shooting. Defendant contends that the trial court's instruc-

tions to the jury regarding the Gracco shooting were improper because they essentially told the jury that defendant's strongest exculpatory evidence was irrelevant. These instructions, in combination with the derogatory remarks of the prosecutor on summation, *see* discussion, *infra* at 467, 575 *A*.2d at 448, also undermined the credibility and integrity of defense counsel, depriving defendant of a fair trial.

The court gave the jury this instruction:

There are a couple of other problems. There are a few *red herrings* in this case. *You know what I mean, someone drug a little something in front of you to get you off the scent.* Avoid that type of thing and keep your eye right on the ball. Remember what it is you're here to decide and remember what the State's burden is [and] what the State's burden is not. I don't mean as to the proof, but, you know, we get into the Gracco thing whatnot. Get it sorted out and be analytical and stay true to the course. [Emphasis added.]

At the close of the court's charge, defendant immediately objected to the "red herring" instruction. Defense counsel argued that the Gracco shooting was one of their defenses and that it was wrong to suggest that he purposely attempted to mislead or distract the jury. Thereafter, the court gave a curative instruction that probably exacerbated the error:

[I]t's pointed out to me that the words red herring is something that may have as many different meanings as the people who are listening to it, and there again, I did not mean to imply that either the State or the defense tried to get something purposely in front of you that would untrack you from your charted course. What I meant was that in this case there has been much testimony and understandably a lot of—*some information and testimony and evidence that really, in my mind, in yours maybe too, but in my mind isn't really relevant* and that's what I meant by when I said don't get sidetracked by a red herring, ... *And don't get off that course because of some testimony of somebody that went off on a tangent that really can't help you or in any way, you know, shed any light on the subject.* [Emphasis added.]

After this "curative" instruction, defendant insisted that the term "red herring" cast him in a bad light, because "defense attorneys are usually thought of as those who drag the red herrings into the case." The court regretted the use of the term and conceded that it "had slipped one gear too low," but nonetheless denied defendant's motion for a mistrial.

The dictionary defines a "red herring" as "something that distracts attention from the real issue." *Webster's Ninth New Collegiate Dictionary* 986 (1987). The use of this term is hardly neutral or benign. "[T]hat which leaves a strong scent can be used for bad purposes as well as good. A dog that gets a good whiff of red herring will lose any other scent that it has been following. Criminals who have been chased by bloodhounds have used that knowledge to advantage." C. Funk, *A Hog on Ice and Other Curious Expressions* 91 (Harper Colophon Edition 1985). The court's use of this expression had undeniably perjorative connotations, conjuring up the notion that defense counsel engaged in a "contrivance ... ruse ... subterfuge ... deceit, trickery." *Roget's International Thesaurus* 483 (3d ed. 1982). The curative charge itself was prejudicial because it did nothing to dispel—it added to—the impression that the Gracco evidence not only was irrelevant but should be shunned because it was deceptive and misleading. Indeed, the court's comments came on the heels of the prosecutor's summation in which the State, on numerous occasions, accused defendant of committing the Gracco shooting and listed the evidence to support such an accusation, lending emphasis to the notion that the defense was a sham. From the bench, the court's comments, directed as they were at one of the defendant's principal defenses, became highly adversarial and partisan.

Because a court's capacity to influence the outcome of a trial is enormous, the revelation in this case of its opinion on the relevancy and cogency of the Gracco defense is extraordinarily prejudicial. *See State v. Lemon,* 107 *N.J.Super.* 101, 105–06, 257 *A.*2d 123 (App.Div.1969) (the judge's charge that "it shouldn't be hard in this case, it shouldn't be hard at all.... you heard it [the facts] and it shouldn't be any trouble whatsoever, none at all," and that "[t]his case wasn't a long case, its a short case," implicitly "placed the weight of his office on the side of the State" and required reversal). The "red herring" remark entailed more than a poor choice of words. The court

threw "[its] judicial weight on one side or the other," *State v. Zwillman*, 112 *N.J.Super.* 6, 20–21, 270 *A.*2d 284 (App.Div. 1970), and entered into the case as an advocate. *United States v. Wilensky*, 757 *F.*2d 594 (D.N.J.1985). The "red herring" charge so seriously created the possibility that the jury disregarded admissible exculpatory evidence that it requires reversal.

## IV.

Defendant contends that the trial court erred in excluding the testimony of Dr. Frederick Evans, an expert on hypnotism. Defendant maintains that because witness William Perona was hypnotized at the State's behest, expert testimony on how hypnotism may have impaired Perona's memory was admissible to affect his credibility. The gist of defendant's complaint is that Perona's pre-hypnotic account of the suspicious man he bumped into at the Holiday Liquor Store around 8:30 p.m. on the night of the murder was clearly exculpatory evidence. After hypnosis, Perona's account altered critically with respect to the time: he then said that he had been in the store prior to 8:00 p.m.—long before Compton was shot. Thus, his post-hypnotic testimony was of limited exculpatory value to defendant.

Defendant further complains that the prosecutor made use of Perona's statement in his opening to bolster the State's case without calling Perona as a witness. Thus, defendant was forced to call Perona, essentially as a hostile witness, but was denied the use of expert testimony to prove that the State's hypnotizing of Perona might have destroyed exculpatory evidence. Furthermore, the expert testimony would have been a relevant means of questioning the reliability of all or part of the post-hypnotic recall of Perona. Defendant maintains that permitting the prosecutor to refer to Perona's post-hypnotic statements along with Detective Jubilee's related "hearsay" testimony without allowing him to show that Perona's pre-hyp-

notic recall might have been more correct constituted an abuse of discretion depriving him of a fair trial.

Following Perona's testimony, the court held an *Evidence Rule* 8 hearing to determine the admissibility of Dr. Evans' testimony. The proffered testimony was that hypnosis can make a person manufacture facts and believe them to be true, and, accordingly, witnesses are more reliable if hypnosis is not used. Furthermore, Evans was prepared to testify that an amnesiac instruction, which had been given to Perona, often causes confusion in the subject. Defendant contended that the expert testimony was admissible to show that the hypnosis session might have affected Perona's ability to reconstruct events, and further to establish that the State may have caused a witness potentially helpful to the defense to be of little use. The court denied the motion to admit the testimony, finding that the defendant sought only to get the "jury to punish the Prosecutor for destroying this witness," not an issue in the case and therefore irrelevant.

The trial court's decision is seriously flawed. Even if it is questionable that Perona's pre-hypnotic statement is any more exculpatory than his second statement because it did not necessarily establish that another person had been there at the relevant time, this clearly should have been presented to the jury fairly and completely. Initially it is clear that the thrust of the expert testimony was not simply to suggest to the jury that the State had somehow tampered with or ruined this important defense witness. Rather, defendant sought to present this expert testimony to impeach Perona's credibility and generally to attack the State's case.

The trial court concluded that the defense is not permitted to impeach the credibility of its own witness absent surprise or recent fabrication. Perona was an affirmative defense witness with respect to the suspicious man he saw in the liquor store that night, who did not fit the defendant's description. However, the unusual posture of Perona as detailing an allegedly

exculpatory time frame prior to hypnosis and an inculpatory one post-hypnosis, and the State's backhanded introduction of his post-hypnotic statement at trial, effectively transformed him into a State's witness with respect to that post-hypnotic recollection. To hold otherwise, that Perona's credibility was not an issue of concern for defendant, is a shortsighted view of both the State's motives and the jury's awareness.

We have in other contexts been extremely critical of testimony elicited from witnesses by experts that may have serious credibility implications. *See State v. Pitts,* 116 *N.J.* 580, 630, 562 *A.*2d 1320 (1989) (rejecting as unreliable sodium amytal-induced testimony). The State availed itself of this hypnotically-refreshed testimony, yet avoided the "strict safeguards to ensure the reliability of the hypnotic procedure" established in *State v. Hurd,* 86 *N.J.* 525, 529, 432 *A.*2d 86 (1981). Even without the benefit of in-court testimony of Perona, the State should have been required to establish both the scientific reliability of the hypnotic procedure and its appropriateness in this case before any reference was made thereto. *State v. Hurd, supra,* 86 *N.J.* at 543, 432 *A.*2d 86. In response, defendant should have been permitted to challenge the results of that procedure on Perona's recollection through expert testimony and to show either that his pre-hypnotic memory was more accurate or that the procedure distorted his recall altogether. *Ibid.*

The trial court's refusal to admit the expert testimony cannot be deemed harmless error. The error, in my opinion, is reversible.

## V.

Defendant raises serious claims of prosecutorial misconduct in the penalty phase of the trial. This misconduct warrants more than a hollow reprimand. It calls for a reversal.

In defendant's original jury challenge, he successfully demonstrated that the Atlantic County jury-selection system was

defective in that it did not comply with statutory requirements for random selection. *See State v. Long*, 204 *N.J.Super.* 469, 499 *A.*2d 264 (Law Div.1985). In the penalty phase, defendant called Leslie DeVault, a fellow inmate, to testify to defendant's character and willingness to counsel other inmates. On cross-examination of DeVault, the prosecutor seized on defendant's legal challenge to the jury-selection system and, in what he later asserted was an effort to rebut the testimony that Ronald Long was "helpful" to other inmates, characterized the jury-system challenge as an "insurrection." [2]

The prosecutor also showed DeVault a flyer that had apparently circulated around the jail regarding the jury challenge. The prosecutor attempted to establish that the flyer was written by defendant and described it as "something that was going to go around to all the prisoners and get them all hepped up over overthrowing the jury system." DeVault said he did not know who had written the flyer, but it could have been Ronald Long. Thereafter, during further cross-examination, the prosecutor elicited testimony that indicated that defendant and the

---

[2]The prosecutor's cross-examination of DeVault consisted of:

Q So you're saying that during the time you were with him and the time that you experienced what he was doing, he was helping inmates and easing their way in the prison, is that right?

A At times, yes.

Q Well, wouldn't you say that rather than helping them, what he was doing was stirring them up?

A No, I wouldn't say that.

Q Wouldn't you say that what he was doing was organizing them so that they would revolt against what was going on in the jail?

A No, sir.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

Q And did there come a time when you and Mr. Long talked about his jury motion, to overthrow the juries?

A Yes, sir, I heard about it.

Q You heard about it. Didn't you plot with Mr. Long so that the jury system would fall and all the prisoners would be let go?

A Plot? What do you mean? No, sir, I did not plot with him.

witness "wanted the jury system overthrown" and all indictments dismissed.[3]

Defense counsel later moved for a mistrial based on the prosecutor's improper and prejudicial cross-examination of De-Vault. Defendant also proffered the court's opinion in the case of *State v. Long* to rebut the prosecutor's inference that this was an unlawful and meritless attack on the jury-selection system. The prosecutor objected to the offer, arguing that defendant "wasn't being helpful. He wanted to start a riot, he wanted to start an insurrection, he wanted the system to fall down." The court did not admit the *Long* decision, but gave

---

[3]This exchange took place:

Q Other than passing on this document, have you ever had any discussions with Ronald Long about this document?
A After he came to the cell block.
Q Well, what were the discussions about?
A Discussion, no, I didn't have no discussion. I wanted to join in on it.
Q You wanted to be part of this?
A Yes, sir.
Q You wanted the jury system to be overthrown, is that right?
A Yes, sir.
Q What's that?
A Yes, sir.
Q And you agreed with the language that was in this, is that right?
A Yes.
Q You did. You agreed that anybody who wanted to freeze their trial and/or sentence join in the State versus Long jury process challenge. When it's over, indictments are going to be dismissed left and right. You wanted to join this, right?
A Yes, sir, I did join.
Q The more people that join in, the more upset the Prosecutor, right?
A Like it is.
Q In other words, you wanted justice to be done. You wanted the Prosecutor to be completely upset, all the indictments dismissed and everybody goes home, is that what you wanted?
A Now you're putting words in my mouth again.
Q It's time to stop getting kicked in the ass by these crooked, high powered assholes. Who are they, the crooked high powered assholes?
A Did I say I agreed with the whole thing? I said I agreed with the part on the back. I didn't say I agreed with that now. You're misconstruing my words again.

the jury a limiting instruction that actually reinforced part of the prosecutor's improper purpose in introducing this line of testimony. The limiting instruction failed to explain that the challenge was, indeed, a meritorious and legitimate assertion of a constitutional right. At the same time, the instruction told the jury that the underlying merits were *irrelevant,* having "[n]othing to do with anything."

Defendant subsequently renewed his motion for a mistrial, arguing that the prosecutor's mischaracterization of his jury-selection-system challenge as a "revolt" or "insurrection" generated the strong inference that "Ronald Long is a problem in the jail [and] is not a fit candidate for a prison sentence." Defendant argued that this left "the jury with the clear alternative that the only other alternative is that he be put to death." That motion was again denied.

The prosecutor clearly employed an exaggerated and distorted version of the facts, characterizing defendant's legal challenge to the jury-selection system as a meritless and subversive plot. The prosecutor obviously misled the jurors, seemingly attempting to inflame them when he said that DeVault and the defendant "wanted all the indictments dismissed and everybody goes home." ABA *Standards for Criminal Justice,* § 3-5.8(a) (2 ed. 1980) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw."). This constitutes, in my view, both invidious name-calling and improper emphasis on defendant's future dangerousness. *See State v. Pennington, supra,* 119 *N.J.* at 583–84, 575 *A.*2d 816. It deprived defendant of a fair trial. *State v. Zola, supra,* 112 *N.J.* at 426, 548 *A.*2d 1022; *State v. Ramseur, supra,* 106 *N.J.* at 322–23, 524 *A.*2d 188.

This form of misconduct undermined defendant's constitutional right to challenge a defective jury-selection system. That misconduct is all the more outrageous because of the

MR. ROSENFELD: Nothing further.

possible chilling effect on the exercise of constitutional rights by other defendants. Furthermore, the impression left by this questioning was that Ronald Long was extremely dangerous— he plots, he stirs things up, he organizes revolts to overthrow our American jury system, he tries to set all the prisoners free. This is analogous to a prosecutor telling the jurors they have a duty to protect society from the future crimes of Ronald Long. *See State v. Rose, supra,* 112 *N.J.* at 519–20, 548 *A.*2d 1058 (urging the jury to sentence defendant to death in order to deter him from future violence and to "send a message" to society, along with other serious acts of misconduct, denied defendant a fair trial). The prosecutor strongly implied that society would be safer if defendant were executed. This aspect of the trial calls for a reversal.

## VI.

The reasons set forth above impel me to conclude that defendant's conviction must be reversed and death sentence vacated.

STEIN, J., dissenting.

The Court reverses defendant's conviction of capital murder on the ground that there was a "slim but rational basis," *ante* at 426, 575 *A.*2d at 446, in the evidence on which the jury could have convicted defendant of serious-bodily-injury murder, pursuant to our decision in *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). Accordingly, the Court remands the matter for a new trial and concludes that issues concerning the penalty phase of the case are moot.

I would affirm the capital-murder conviction, and proceed to determine on the merits defendant's challenges to the death sentence. We held in *Gerald* that under our state constitution, one who takes the life of another with "an intent to inflict only serious bodily injury with no intention that death be the result" cannot be subjected to the death penalty. 113 *N.J.* at 89, 549

*A.2d* 792. I cannot find evidence in this record that affords a rational basis for a jury to conclude that defendant purposely or knowingly caused only serious bodily injury "with no intention that death be the result."

As the majority opinion acknowledges, there was no testimony adduced at trial describing how the murder of Albert Compton occurred. A customer found the victim's body lying immobile behind a counter in the Holiday Liquor Store. Compton died at the hospital one hour later. Ballistic evidence indicated that the hollow-nosed bullet found in the victim's body had been fired from a .25 caliber handgun. The State's ballistic expert testified that the discharged shell casing, found in a calculator on the liquor-store counter, would have traveled six to ten feet from the point of firing. The Atlantic City Medical Examiner, who performed an autopsy on the victim, testified to the presence of a bullet wound on the front of the chest, close to the heart. He stated that the bullet "had passed through the front of the body, went underneath the rib cage, went through the liver, through the pancreas * * *, through the aorta * * * and came to rest in the soft tissues next to the spinal column." The medical examiner concluded that the victim bled to death from the bullet wound. The State also offered evidence that $795.71 was missing from the liquor store's cash register.

The only other evidence about the shooting came from Paul Pettigrew, whom defendant had met in the Atlantic County jail. According to Pettigrew, defendant admitted shooting Compton, relating that he and his cousin had gone into the store to buy liquor. He told Pettigrew that Compton got the liquor he asked for, then reached under the counter, and that he shot him "because he didn't know what the man was reaching for, a bag to put the alcohol in or getting a gun." Pettigrew testified that defendant said "he had to shoot him anyway because he didn't want to leave [a] witness behind." Defendant denied making any such statements to Pettigrew.

Unlike the instructions on capital murder in *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990), and *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990), in which murder was defined as "purposely" or "knowingly" causing death *or* serious bodily injury resulting in death, the trial court's instruction on capital murder in this case was as follows:

> Criminal homicide constitutes capital murder when the actor purposely or knowingly causes, by his own conduct * * * the death of another.

Conceding that "[t]he question is a close one," *ante* at 460, 575 *A.*2d at 445, the Court concludes that a jury could infer that defendant intended to cause Compton serious bodily injury but not death. I disagree. No evidence in the record suggests that the defendant's "conscious object" was to cause only serious bodily injury and not death, or that defendant was "practically certain" that only serious bodily injury and not death would result. See *N.J.S.A.* 2C:2-2b(1) and (2) (defining "purposely" and "knowingly"). It is a matter of common experience that a handgun fired at close range and aimed at or near the heart of a victim is likely to cause death. The risk of death under such circumstance is so great, I submit, as to be virtually incompatible with an intent merely to inflict serious bodily injury. Put differently, one whose "conscious object" was to inflict serious bodily injury but not death, or who wished to be "practically certain" that only serious bodily injury but not death would result, would never attempt to achieve that objective by shooting the intended victim in the chest at close range. Absent explanatory testimony that the gun was pointed at a less vulnerable area of the victim's body or that the lethal wound was caused unintentionally, the evidence in this record is irreconcilable with an intention to cause only serious bodily injury, but not death.

In *Gerald* we held that under our state constitution the death penalty cannot be imposed on "those who act with a less culpable state of mind, *i.e.*, an intent to inflict only serious bodily injury with no intention that death be the result." 113 *N.J.* at 89, 549 *A.*2d 792. We have never held that *Gerald*

precludes the imposition of the death penalty on a defendant who shoots and kills a victim at close range, intending *either* death *or* serious bodily injury, but indifferent to which of those consequences actually occurred. My reading of *Gerald* is that such a defendant remains subject to the death penalty.

As I observed in *State v. Coyle, supra,* 119 *N.J.* at 201, 574 *A.*2d at 954, "homicide cases in which the killing was committed with a gun fired at close range * * * ordinarily will not fit within the class of serious-bodily-injury murders that we immunized from the death penalty in *Gerald.*" Because I conclude that this record does not provide a rational basis for a charge on serious-bodily-injury murder, I would sustain defendant's conviction of capital murder.

Justice GARIBALDI joins in this opinion.

*For reversal, vacation and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK and O'HERN—4.

*Dissenting* —Justices GARIBALDI and STEIN—2.

*Concurring in part, dissenting in part* —Justice HANDLER—1.